## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| MELISA INGRAM and ROBERT REEVES | No. _____ |
| Plaintiffs, | **Class Action** |
| v. | |
| COUNTY OF WAYNE, | |
| Defendant. | |

## COMPLAINT

1.     This civil-rights lawsuit challenges the constitutionality of Wayne County's vehicle seizure and civil-forfeiture practices.

2.     Named Plaintiffs Melisa Ingram and Robert Reeves are lifelong Detroiters who seek declaratory relief, injunctive relief, and compensation on behalf of themselves, and a class of similarly situated people, for the county's systematic violation of rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

3.     Wayne County has an official policy of unreasonably seizing cars and other personal property without probable cause to believe that the car (or other property) is connected to a crime.  As a result, it is now institutionalized practice for police and sheriff's deputies in Wayne County

to seize cars simply because they are driven into, or out of, an area subjectively known for having some generalized association with crime. Additionally, cars (and other personal property) are seized based on their general proximity to *other people*'s alleged crimes—for example, leaving a house suspected of harboring drugs or prostitution, or driving to and from a job site where *someone else* may have stolen construction equipment.

4.     Innocent property owners find themselves ensnared in this system, facing the seizure and permanent loss of their car or other property, even when *someone else* is alleged to have committed a crime without the property owner's knowledge or consent.  Seldom, if ever, is *anyone* arrested, let alone charged with and convicted of a crime.  Frequently, the property owner is never *suspected* of a crime.  And yet, the county offers just one expeditious means for such a person to get his property back: He must pay hefty fines and fees to support the budget of the very police and prosecutors who took his property and will not return it.

5.     This system is unconstitutional because it incentivizes seizures of property without probable cause, causes the unreasonable detention of vehicles without probable cause, denies property owners (innocent and suspect alike) due process of law, deprives property owners of a prompt, post-seizure hearing, imposes excessive fines and forfeitures, and (in the

case of nuisance-abatement forfeitures) denies innocent owners *any* opportunity to show to a court that they did not know about or consent to the crime on which a given forfeiture is based.

6.      This all happened to Melisa and Robert, both of whom had their cars seized for crimes that *someone else* allegedly committed without their knowledge or consent.  Then they found themselves caught up in the county's unconstitutional forfeiture practices, which lead, inevitably, to innocent people losing their property, being injured financially, and being denied bedrock constitutional rights in the process.

7.      Named Plaintiffs and the proposed class ask the Court to declare unconstitutional and enjoin the following official policies and practices of Wayne County:

> a.      The county's policy and practice of unreasonably seizing the vehicles of innocent owners for offenses committed by other people.

> b.      The county's policy and practice of unreasonably seizing vehicles (and other property) for nothing more than being in an area known for drugs or prostitution.

c.     The county's policy and practice of unreasonably seizing vehicles (and other property) based on nothing more than a vehicle's proximity to other people's alleged crimes.

d.     The county's policy and practice of imposing substantial fines and fees on innocent owners for offenses committed by other people.

e.     The county's policy and practice of requiring the owner of a seized vehicle to pay an arbitrary "redemption fee," plus towing and storage fees, in order to regain possession of the vehicle and any personal belongings within.

f.     The county's policy and practice of systematically denying due process of law to owners of seized vehicles and other property.

g.     The county's policy and practice of providing constitutionally inadequate notice to owners and lien-holders when vehicles are seized while someone other than the owner is driving.

h.     The absence of any innocent-owner protections in Michigan's nuisance-abatement law, *see* MCL § 600.3815(2), and the county's systematic policy and practice of denying innocent owners an opportunity to regain possession of their vehicles (or other

4

property) by demonstrating they did not know about or consent to the alleged misuse of their property.

       i.     The county's policy and practice of seizing everything in a person's car when there is not probable cause to believe that the personal property within the car has any connection to crime.

       j.     The county's policy and practice of denying property owners a prompt, post-seizure hearing—that is, an opportunity to contest the seizure and retention of property during the pendency of a civil-forfeiture or nuisance-abatement action.

       k.     The county's policy and practice of unreasonably delaying the initiation of civil-forfeiture proceedings for months, or even years, when an owner invokes his or her right to contest forfeiture.

8.     Named Plaintiffs seek an injunction ordering the payment of restitution for themselves and members of the class under 42 U.S.C. §§ 1983 and 1988, for these and other injuries set forth below.  In the alternative, Named Plaintiffs seek compensatory damages.

## JURISDICTION AND VENUE

9.     Named Plaintiffs bring this action under Section 1 of the Fourteenth Amendment to the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988; the Declaratory Judgments Act,

28 U.S.C. §§ 2201 and 2202; this Court's equitable powers under 28 U.S.C. § 1331; and Rule 41(g) of the Federal Rules of Criminal Procedure.

10. This Court has jurisdiction under 28 U.S.C. § 1331.

11. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2).

12. Detroit is the proper place for holding court. *See* E.D. Mich. LR 83.10(a)(1), (b)(3)–(4) and (b)(6)–(7).

## PARTIES

### Melisa Ingram

13. Plaintiff Melisa Dawn Ingram is a lifelong resident of the Detroit area. She lives in the City of Southfield, Oakland County, Michigan.

### Robert Reeves

14. Plaintiff Robert Terrell Reeves is a lifelong resident of the City of Detroit, Wayne County, Michigan, where he lives with his wife and five children.

### Defendant and Service of Process

15. Defendant, the Charter County of Wayne, Michigan, is a local government organized under the laws of the State of Michigan. The county is headquartered in Detroit, where it can be served through its Corporation Counsel at 500 Griswold Street.

16. Although the state is not a party, Plaintiffs have notified the Attorney General of the State of Michigan of the constitutional questions

raised by this case and have sent this complaint to the Attorney General's office by certified or registered mail.  *See* Fed. R. Civ. P. 5.1(a).

## Class Members

17.    Named Plaintiffs seek to certify a class of similarly situated individuals under Rule 23 of the Federal Rules of Civil Procedure.  The class is defined as follows:

> All persons who own a vehicle (or other property within that vehicle) that has been or will be seized by Defendant Wayne County pursuant to MCL § 333.7521 or MCL § 600.4701 on or after February 5, 2018 and before the date of class certification.

*See* ¶ 96 *below.*

## FACTUAL ALLEGATIONS

## Melisa's Experience

18.    Melisa Ingram has lived in and around Detroit her whole life. She is a 50-year-old single mother of two adult children.

19.    Melisa works full-time at BlueCross/BlueShield in downtown Detroit.  She is currently the team leader for a group of claims adjustors.

20.    Melisa is attending night school to earn a Bachelor of Arts in health and human services.  This requires her to attend classes after work, four nights per week, and it requires that she study and complete assignments on her own time.

21.    In late 2018, Melisa loaned her 2017 Ford Fusion to her then-boyfriend, Edland Turner, so that he could look for a job.  After dropping Melisa off at work, Edland allegedly used the car for something she never would have allowed: picking up a prostitute.  Although no one was arrested, Melisa's car was seized on the spot by two Wayne County Sheriff's deputies. Several days later, Edland admitted what had happened to Melisa's car and gave her the seizure notice that he had received.  *See* Exhibit A: Notice of Seizure & Intent to Forfeit (Nov. 20, 2018).  He denied the crime to her.

22.    Exhibit A is a true and correct copy of the seizure notice that Edland gave to Melisa, with necessary redactions.  *See* Fed. R. Civ. P. 5.2(a).

23.    The notice explains that Melisa's car was seized based on Michigan's nuisance-abatement law.  *See* MCL § 600.3801.  That law makes it irrelevant whether Melisa knew about, or consented to, the alleged illegal use of her car.  On the contrary, it allows the government to forfeit property when its owner had no idea that it was being used for an illegal purpose. *See* MCL § 600.3815(2) ("proof of knowledge of the existence of the nuisance on the part of 1 or more of the defendants is not required").

24.    Based on instructions in the notice, Melisa went downtown to the Vehicle Seizure Unit of the Wayne County Prosecutor's Office and begged them to return her vehicle.  She needed her car to get to work and

school in the cold Michigan winter.  She also needed the personal property that happened to be in the car when it was seized.  With no other means of getting her car back quickly, Melisa agreed to pay $1,355—*i.e.*, a $900 "redemption fee" paid to the Wayne County Prosecutor's Office, plus towing ($175) and storage ($280) fees paid to Martin's Towing.  The county promptly released the car.

25.    Melisa was not sure whom to believe about Edland's behavior. Regardless, she made it crystal clear that he was never to use her car for any illegal purpose, especially prostitution.  Edland promised that he would not.

26.    In June 2019, Melisa again loaned her car to Edland so that he could attend a friend's barbecue.  As he was driving away from the event alone, the same two Wayne County Sheriff's deputies pulled him over and seized the car a second time.  The deputies claimed that the house Edland was leaving was, in some way, connected to drugs or prostitution.  Melisa does not know if that is true or not.  But again, no one was arrested.  And no further action seems to have been taken against the owners of the home in question.  Rather, one of the deputies drove off with Melisa's car (and everything inside—including Melisa's clothes, CDs, and other personal property having no possible connection to crime).  *See* Exhibit B: Notice of Seizure & Intent to Forfeit (June 17, 2019).

27.    Exhibit B is a true and correct copy of the second notice that Edland gave to Melisa, with necessary redactions.  *See* Fed. R. Civ. P. 5.2(a).

28.    This being the second time, the Vehicle Seizure Unit demanded that Melisa pay a "redemption fee" of $1,800, plus towing and storage fees. Melisa did not have that kind of money, especially after she had paid $1,355 to get the same vehicle back six months earlier.

29.    In fact, Melisa had begun bankruptcy proceedings shortly after the first seizure.  In connection with those proceedings, the U.S. Bankruptcy Court for the Eastern District of Michigan recently adopted a final Chapter 13 bankruptcy plan under which Melisa has surrendered her interest in the car to its lien holder—Ford Motor Credit.

30.    If not for the first seizure of her car, Melisa would not have declared bankruptcy.  The second seizure only compounded her financial problems and led her to release the vehicle to Ford in bankruptcy.

31.    Despite Melisa's formal surrender of her interest in the car— and her repeatedly informing the county of that fact—the Wayne County Prosecutor's Office initiated forfeiture proceedings, as if Melisa still owned the car.

32.    The county's forfeiture action named Melisa (but not Ford) as the vehicle owner and claimant.

33.   Within 20 days of the filing of the county's forfeiture complaint, Melisa had to get an attorney and file an answer to the county's forfeiture complaint, lest she lose her property by default.

34.   At the time of filing, the county obtained a court order compelling Melisa to attend a so-called "pre-trial conference," at which county prosecutors told her they would not speak with her because she had filed an answer to their forfeiture complaint.

35.   For seven months, the office would not allow Melisa to retrieve her personal belongings from the car, despite numerous requests—both in person and in writing—that she be allowed to do so.

36.   In late 2019, Melisa's counsel contacted county prosecutors and persuaded them to recognize that Ford—not Melisa—was the only proper claimant to the vehicle, and that Melisa should be allowed to retrieve her things.

37.   On January 14, 2020, the Wayne County Circuit Court accepted the parties' agreed order dismissing the county's forfeiture action with prejudice and giving Melisa 14 days within which to retrieve her things.

38.   Once this order was signed, Melisa was able to retrieve her personal property from the car (although she was told that her license plates must remain with the vehicle).

39.    After the second seizure, Melisa and Edland broke up.

## Robert Reeves's Experience

40.    Robert Reeves is 29 years old.  He works construction and fixes cars.

41.    He has lived in Detroit his whole life.  He lives with his wife and her four children, whom he is raising as his own, and with one child from his previous marriage.

42.    In early 2019, Robert purchased a 1991 Chevrolet Camaro for $5,500 cash.  Over the next several months, he spent over $9,000 improving the vehicle—repainting, installing an air-intake scoop, new audio equipment, and wheels, tires, and rims, among other improvements.  He was hoping to sell the car for a profit and to use the proceeds to start another car project.

43.    In July 2019, a man with whom Robert sometimes works asked him to visit a job site where he was clearing rubbish.  The man had a skid-steer loader at the site and wanted to know if Robert knew how to operate it.  Robert demonstrated how to use the equipment and the two men planned to meet the next day to begin their work.

44.    Robert then drove to a nearby gas station and went inside to purchase a bottle of water.  As he was leaving, officers surrounded him and

demanded to know what he knew about a skid steer that was allegedly
stolen from Home Depot.  Robert knew nothing other than that the other
man had rental paperwork from Home Depot, which was consistent with
Robert's understanding that the equipment had been rented.  After several
hours of detention in the back of a police car, Robert was let go without
being arrested.  He has not been charged with anything.

45.     Police seized Robert's Camaro on the spot, along with two cell
phones and $2,280 that he had in his pocket.

46.     Robert had this money because, earlier that day, he had looked
at a 2002 Ram truck he was interested in buying and, as is customary
among car traders, buying the vehicle would have required cash.  (He
decided against it.)  One of his two cell phones was for work-related calls
and texts; the other was Robert's personal phone.

47.     On information and belief, no one has been arrested for the
alleged skid-steer theft; but police also seized the other man's truck and
briefly arrested him for allegedly violating his parole by possessing stolen
property (*i.e.*, the skid steer).

48.     In the more than six months since, no forfeiture complaint has
been filed against Robert's vehicle (and other property), and there has been
no opportunity for him to contest the seizure.  In fact, the county's seizure

notice advises that "[a] civil forfeiture matter may follow the criminal proceeding which will require further process of which you will be notified" and invites questions. *See* Exhibit C: Notice of Seizure & Intent to Forfeit (July 26, 2019).

49.    Exhibit C is a true and correct copy of that notice, with necessary redactions. *See* Fed. R. Civ. P. 5.2(a).

50.    Robert called the numbers listed on the notice dozens of times. He was eventually told by the Vehicle Seizure Unit that he would need to get an attorney if he wanted to get answers. Robert then hired an attorney, but employees of the Vehicle Seizure Unit and Wayne County Prosecutor's Office refused to speak with his attorney, too. No one will take their calls, despite dozens and dozens of attempts to learn more.

### Named Plaintiffs' Experiences Are Common

51.    What happened to Melisa and Robert is not the exception; it is the rule in Wayne County. Every year, hundreds of people—including innocent people like Melisa and Robert—find themselves ensnared in the county's unconstitutional system of seizures and forfeitures.

52.    The county's abusive practices are fueled by the fact that Michigan law permits seizing agencies to keep up to 100% of the proceeds of property that they seize and forfeit. *See* MCL § 333.7524(1)(b)(ii).

53.     Over the last two years, Wayne County has forfeited no fewer than 2,600 cars and collected not less than $1.2 million in revenue.  *See* https://www.michigancapitolconfidential.com/wayne-county-doubling-down-on-forfeiture-as-legislature-moves-to-reform-it.

54.     The county's policies and practices are not calculated to get at the truth; they are calculated to ensure that forfeiture activity benefits the county financially.

### The County Systematically Violates Constitutional Rights

55.     At the time of seizure, police serve a vehicle's driver with a Notice of Seizure and Intent to Forfeit.

56.     If the vehicle owner is someone other than the driver, county prosecutors routinely fail to serve notice on the vehicle's registered owner, despite a legal obligation to do so.  *See* MCL §§ 333.7523(1)(a), 600.4704.

57.     A seized car remains impounded until the owner either abandons the vehicle (and any property within it) or pays what the county calls a "redemption fee" of no less than $900, plus towing and storage fees, which can total $640 or more in a single month.

58.     In vehicle seizure cases based on Michigan's Controlled Substances Act, *see* MCL § 333.7521, owners are given just 20 days in which

to pay the county's demand, contest forfeiture, or abandon the property. *See, e.g.*, Exhibit A.

59.   In vehicle seizure cases based on the nuisance-abatement law, *see* MCL § 600.3801, owners are given 30 days in which to pay the county's demand, contest forfeiture, or abandon the property, *see* Exhibit A.

60.   The county's failure to serve vehicle owners virtually guarantees that innocent owners will unintentionally abandon their vehicles when the person driving does not give the vehicle owner the seizure notice.  And it guarantees that people who pay to get their cars back will pay more in storage fees than they would have, had they been given prompt notice.

61.   When property is seized based on Michigan's Omnibus Forfeiture Act, MCL § 600.4701, there is no timeline of any kind.  Instead, the county's seizure notice advises owners that "[a] civil forfeiture matter may follow the criminal proceeding which will require further process of which you will be notified."  *See* Exhibit C.  Property owners and their attorneys are invited to contact the Asset Forfeiture Unit of the Wayne County Prosecutor's Office.  But when an owner or attorney does so, they are uniformly ignored.

62.   Due process is systematically denied to property owners by the county and by Michigan's courts.  Few (if any) seizures lead to forfeiture

cases resolved by a judge.  In most cases, property owners agree to pay the

county for the return of their property with zero judicial oversight.  When

property is abandoned or its owner cannot afford to pay, the Vehicle

Seizure Unit and its parent, the Asset Forfeiture Unit, will forfeit the

property—again with zero judicial oversight.

63.    When an owner manages to contest a seizure, prosecutors

frequently wait six months or longer before filing a forfeiture complaint.

64.    Once a complaint is filed, county prosecutors obtain an order

from a judge of the Wayne County Circuit Court compelling the property

owner to attend a so-called "pre-trial conference."

65.    This "pre-trial conference" does not involve a judge, however; it

is a meeting between prosecutors and the property owner.  If the owner

fails to appear, the property will be deemed abandoned and forfeited to the

county, with no further process.  If the owner attends, he or she will be

pressured to do one thing: pay the redemption fee, plus towing and storage.

Owners are told that the only way to obtain the pre-judgment release of

their car is to pay the redemption fee, plus towing and storage.

66.    The redemption fee is nonnegotiable.

67.    According to the county's standard Notice of Seizure and Intent

to Forfeit, redemption fees escalate as follows: "$900.00 (1st seizure),

$1,800.00 (2nd seizure), $2,700.00 (3rd seizure), etc. plus towing and storage." *See* Exhibit A.

68.     Towing fees are generally between $100 and $300.

69.     The daily storage fee accrues at a rate of $15 per day, adding up to $465 in a typical month.

70.     It is the county's policy and practice to allow the Vehicle Seizure Unit and Asset Forfeiture Unit to resolve seizures in this way until the fourth encounter with an individual vehicle owner, at which point prosecutors must be consulted.

71.     Property owners are never given an opportunity to recover personal property from their vehicles, unless they make payment in full and the vehicle is returned.

72.     No prompt post-seizure hearing is available—meaning that vehicle owners have no opportunity to contest the seizure and retention of their property during the pendency of a civil-forfeiture or nuisance-abatement action.

## Injury to Named Plaintiffs

73.     Despite having done nothing wrong, the county has deprived Named Plaintiffs of their vehicles for half a year or longer.

74.     Named Plaintiffs have found the Vehicle Seizure Unit and Asset Forfeiture Unit work like an adversarial DMV—where government employees are unwilling to answer questions or help solve problems; rather, the employees of those units are routinely rude, unhelpful, suspicious, and seemingly concerned with one thing: maximal financial recovery for the county.

75.     The county's policies required Named Plaintiffs to appear in person multiple times to challenge the seizure of their vehicles.  This caused them to miss work, miss time with their families, and miss opportunities to better themselves by, for example, studying.

76.     Named Plaintiffs each made dozens of calls to the county. Melisa sent many emails, statements, and paperwork.  Robert estimates that he has called more than 100 times since his vehicle was seized.  They both have engaged lawyers to call multiple times on their behalf.

77.     For all her efforts, it took nearly seven months for Melisa to persuade the county of two simple facts—that Ford owned the vehicle and that she should be permitted to retrieve her personal belongings from the car.

78.    Zero progress has been made toward resolving the seizure of Robert's property, despite the county having taken it from him more than six months ago.

79.    The county deprived Named Plaintiffs of the opportunity to assert an innocent-owner defense to the seizure of their vehicles.

80.    The county subjected Named Plaintiffs to the seizure and retention of their car (and other personal belongings) without the opportunity for a prompt, post-seizure hearing; without a full hearing before a judge; and before a court had any opportunity to enter a final judgment deeming them in some way responsible for the alleged criminal activity on which the county's seizure of the cars is based.

81.    Melisa had to pay $1,355 to get her car back after the first seizure.

82.    The second time that her car was seized, the Vehicle Seizure Unit told Melisa that she would have to pay an $1,800 "redemption fee," plus towing and storage fees, as of the day that her car is released.

83.    As of the filing of this complaint, towing and storage fees for the second seizure would total $3,285, according to the company in possession of the car—Martin's Towing in Brownstown Township.

84.    Each passing day adds $15 to the storage fee.

85.     Melisa repeatedly asked county employees and agents to allow her to access the car long enough to retrieve her personal belongings, but she has been told that would be impossible unless she paid all the fees.

86.     Melisa would not have declared bankruptcy if it were not for the first seizure and the effect that it had on her finances.

87.     Robert was unreasonably detained in connection with the police investigation into the allegedly stolen skid steer.

88.     The seizure of his Camaro caused Robert to lose out on a potential sale of the vehicle several weeks after the seizure.

89.     Robert's approximately $9,000 of work to improve the Camaro has been wasted now that the car has been sitting on an impound lot, exposed to the elements, for more than six months.

90.     At the time of the seizure of his vehicle, Robert saw that police intended to tow the vehicle using a towing method incompatible with a small sports car.  Robert warned the police that towing the car in that way would likely result in the axle being cracked or otherwise broken, but the police persisted with their chosen towing method.  Even if the vehicle is returned to Robert, it is likely to be unusable.

91.    Robert has been deprived of the use of his business cell phone and his personal cell phone, although he has continued to make payments on both.

92.    Robert has been denied the use of his $2,280, which police unreasonably seized in connection with their seizure of his car and cell phones.

93.    On information and belief, Robert would owe $2,505 in storage fees and $175 in towing fees, as of the date of this complaint, should the county offer to allow him to pay to retrieve his vehicle as it has in similar cases.  Each passing day adds $15 to the storage fee.

## CLASS ACTION ALLEGATIONS

94.    Named Plaintiffs seek to maintain this action on behalf of themselves and all others similarly situated under Rule 23(a) and (b)(2)–(3) of the Federal Rules of Civil Procedure.

95.    The county's conduct toward Named Plaintiffs is part of a broader policy and practice under which the county seizes vehicles, including from innocent owners, fails to provide adequate notice or opportunity to be heard, and continues holding them until the owner pays a "redemption fee," towing, and storage fees.

96.    Named Plaintiffs are representative of a proposed class with the following proposed definition:

> All persons who own a vehicle (or other property within that vehicle) that has been or will be seized by Defendant Wayne County pursuant to MCL § 333.7521 or MCL § 600.4701 on or after February 5, 2018 and before the date of class certification.

97.    Named Plaintiffs and members of the class have faced, or will face, the following pattern of behavior by the county.  First, the county seizes and impounds a vehicle, including as the result of the actions that a non-owner took without the owner's knowledge.  The county does not arrest anyone in connection with the seizure.  Notice is provided to the driver on the spot, regardless of whether the driver is the owner.  Police drive the vehicle away.  Next, the county pressures the owner to pay a "redemption fee," plus towing and storage fees, without any judicial process.  Finally, the county retains the vehicle until the owner completes payment of the full balance of the administrative penalty, towing fee, and storage fees.  Throughout this process, Named Plaintiffs and members of the class struggle to overcome the county's inadequate notice to vehicle owners and the requirement of multiple in-person appearances to challenge the seizure.

98.    Members of the class have suffered the same and similar injuries as those suffered by the Named Plaintiffs.  *See* ¶¶ 73–93 *above*.

99.    Named Plaintiffs and members of the class have not, and will not be able to, assert innocence as a defense to the seizure of their vehicles—both as a practical matter and as a matter of law under Michigan's nuisance-abatement statute.  *See* MCL § 600.3815(2).

100.   Named Plaintiffs and members of the class have been, or will be, injured by these policies and practices, which violate the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

101.   The class satisfies all requirements for class certification set forth in Rule 23(a) of the Federal Rules of Civil Procedure.

102.   **Numerosity.** The proposed class is so numerous that individual joinder of all members is impracticable.  In the last two years alone, the county has forfeited no fewer than 2,600 cars.  *See* https://www.michigancapitolconfidential.com/wayne-county-doubling-down-on-forfeiture-as-legislature-moves-to-reform-it.

103.   **Commonality.** This action presents questions of law and fact common to the proposed class, resolution of which will not require individualized determinations of the circumstances of any one Plaintiff.

    a.    Common questions of fact include, but are not limited to:

i.      Does the county seize and forfeit vehicles for offenses committed by non-owners without the owner's knowledge or consent?

ii.      Does the county impose at least partly punitive financial penalties and fees on innocent vehicle owners?

iii.      Does the county seize and forfeit vehicles before final judgment has been entered?

iv.      Does the county seize and forfeit vehicles and other property without probable cause to believe the property is connected to a crime?

v.      Does the county charge storage fees for periods when the owner does not have notice of seizure?

vi.      Does the county require unnecessary personal appearances by people whom the county knows may not have a vehicle?

vii.      Does the county seize vehicles and delay the initiation of forfeiture proceedings for unreasonably long periods of time in the hope that the owner will agree to pay for the vehicle's return?

    viii.  How long has the county had such policies and practices?

  b. Common questions of law include, but are not limited to:

    i.  Does the county's imposition of financial penalties on innocent vehicle owners violate the Eighth and Fourteenth Amendments to the U.S. Constitution?

    ii.  Does the county's seizure and retention of vehicles before final judgment violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution?

    iii.  Does the county's insufficient notice to vehicle owners violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution?

    iv.  Does the county's continued seizure of vehicles until owners complete payment of fines and fees violate the Fourth Amendment to the U.S. Constitution?

104. **Typicality.** Named Plaintiffs' claims are typical of the claims of the proposed class.

a.    Named Plaintiffs' claims, as well as those of the proposed class, arise out of the same course of conduct by the county, are based on the same legal theories, and involve the same harms.

b.    Additionally, Named Plaintiffs are seeking the same relief for themselves and members of the proposed class.

105. **Adequacy.** Named Plaintiffs will fairly and adequately protect the interests of the class they seek to represent.  Named Plaintiffs are members of the proposed class, and their interests are aligned with the interests of other class members.  Named Plaintiffs' interest is seeking to end the county's practices of seizing the vehicles of innocent owners and charging these owners fines and fees.  Additionally, Named Plaintiffs have an interest in ending the county's practice of holding vehicles ransom for payment of fines and fees.  Further, Named Plaintiffs have an interest in securing constitutionally adequate procedures when facing the deprivation of their property rights.  Named Plaintiffs seek declaratory and injunctive relief for the injury caused by these practices.  These interests are ensuring that the county's policies and practices of seizure and forfeiture comply with the constitutional rights of car owners and securing relief for those constitutional rights already violated.  Those interests are shared by all class members.

106.  **Class Counsel.** The attorneys for Named Plaintiffs will fairly and adequately represent the class.  Named Plaintiffs are represented *pro bono* by Wesley Hottot and Kirby Thomas West of the Institute for Justice and by Barton Morris, an experienced Michigan litigator.  The Institute is a 501(c)(3) non-profit with experience litigating class-action lawsuits around the country, including civil-rights cases involving similar claims litigated in federal court in Chicago, Illinois; Philadelphia, Pennsylvania; and Pagedale, Missouri.  Mr. Hottot recently handled a forfeiture case in the U.S. Supreme Court as counsel of record for the petitioner—a case in which he argued and won a unanimous reversal.  *See Timbs v. Indiana*, 139 S. Ct. 682 (2019). Institute attorneys, including Mr. Hottot and Ms. West, have litigated dozens of constitutional challenges to seizures and forfeitures across the country.

107.  The class is entitled to the requested declaratory relief, injunctive relief, compensation, and attorneys' fees and costs.

108.  The class satisfies the requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure because the county has both acted and refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

109.    Specifically, the county has a policy and practice of unreasonably seizing property from class members without probable cause connecting the property to a crime as set forth below.

110.    The county has a policy and practice of depriving all class members—innocent, suspect, and guilty alike—of procedural due process and substantive due process as set forth below.

111.    And the county has a policy and practice of imposing constitutionally excessive financial penalties on innocent members of the class as set forth below.

112.    The class likewise satisfies the requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure because the questions of law and fact common to class members predominate over any questions affecting only individual members and because a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

113.    Specifically, the county's policy and practice of seizing vehicles and (regardless of the factual circumstances) returning them to their owners based on an arbitrary redemption fee, towing, and storage fees virtually guarantees that no member of the class will individually challenge the systematic deprivation of constitutional rights described in this complaint.  On the contrary, the county gives individual property owners

every incentive to pay the fees required to quickly release their vehicle or other property, rather than paying to litigate the systematic constitutional violations described in this complaint.

114.   Plaintiffs are aware of just two challenges to aspects of the county's policy and practices that are at issue in this case.  First, a case is pending before the Sixth Circuit in which the plaintiff asserts a right to a prompt, post-seizure hearing in his individual circumstances.  *See Nichols v. Wayne Cty.*, No. 19-1056 (6th Cir 2019).  Although *Nichols* was originally filed as a class action, the class claims have since been abandoned.  Second, a case is pending in this Court, in which the plaintiff asserts a violation of the Excessive Fines Clause of the Eighth Amendment to the U.S. Constitution in the individual circumstances of her seizure.  *See Sisson v. Charter Cty. of Wayne*, No. 4:18-cv-13766-MFL (E.D. Mich. 2019).  Neither case asserts the systematic constitutional violations at issue in this case. Neither case involves class claims.  Neither case proposes to challenge the county's unconstitutional policy and practice in a comprehensive manner. Either case could be mooted by way of settlement, without the class seeing any benefit.

115.   Litigation concerning the class claims at issue should be concentrated in Wayne County because the county's seizure policy and practices lie at the heart of this case.

116.   Few (if any) difficulties are likely to arise in managing a class action of this kind in this forum.

## CONSTITUTIONAL VIOLATIONS

### Count I
### (Fourth Amendment to the U.S. Constitution—
### Unreasonable Seizure and Unreasonable Retention)

117.   Plaintiffs incorporate Paragraphs 1 through 116 by reference as though fully alleged in this paragraph.

118.   The Fourth Amendment to the U.S. Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

119.   A seizure occurs when there is some meaningful interference with an individual's possessory interests in his or her property.

120.   Even if a seizure is justified when the property is initially seized, the government's continued detention of property is equally subject to the protections of the Fourth Amendment.  Thus, a seizure violates the Fourth

Amendment if it is unreasonable at the time of seizure or if it later becomes unreasonable with the development of events, based on new information, or with the passage of time.

121.    The county unreasonably seizes cars (and other property) without probable cause to believe that the property is connected to a crime for which the owner can be held accountable.  This practice imposes quickly accruing fees—at least $1,100 in the first two days alone—on those innocent people who, for whatever reason, wish to pay the county to quickly release their car (and other property).

122.    The county also unreasonably keeps cars (and other property) by conditioning their release on the owner's payment in full of a "redemption fee," plus towing and storage fees.

123.    The county routinely takes an unreasonable amount of time to file forfeiture proceedings against cars (and other property) and, by doing so, unreasonably seizes cars (and other property) far beyond constitutionally permissible time limits.

124.    The county may not condition the return of Plaintiffs' personal property on the payment of a "redemption fee," as well as the payment of fees that accrue only because the county refuses to release the vehicle.

125.   The county's policy and practice of seizing and impounding cars based simply on their presence in an area subjectively known to officers as having a connection to prostitution or drugs effect unconstitutional seizures in violation of the Fourth Amendment to the U.S. Constitution.

126.   The county's policy and practice of seizing and impounding cars based simply on their proximity to crimes allegedly committed by someone other than the driver and owner of the car effect unconstitutional seizures in violation of the Fourth Amendment to the U.S. Constitution.

127.   Declaratory and injunctive relief is necessary to remedy the county's unconstitutional conduct of unreasonably seizing vehicles. Without appropriate declaratory and injunctive relief, the county's unconstitutional policies and practices will continue.

## Count II
### (Eighth Amendment to the U.S. Constitution—Excessive Fines and Forfeitures)

128.   Plaintiffs incorporate Paragraphs 1 through 116 by reference as though fully alleged in this paragraph.

129.   The Eighth Amendment to the U.S. Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

130.   The financial penalties imposed under the county's seize-and-ransom policy, as set forth above, are at least partly punitive and thus within the protections of the Excessive Fines Clause.

131.   The Excessive Fines Clause prevents the government from levying disproportionate penalties and protects innocent people from disproportionate punishment.

132.   Because an innocent owner—who did not authorize or know about the crime of another—has not violated any law, *any* punishment levied upon him or her is *per se* disproportionate and in violation of the Excessive Fines Clause.

133.   The county's demand that innocent owners pay penalties for crimes allegedly committed by another violates the Excessive Fines Clause.

134.   Declaratory and injunctive relief is necessary to remedy the county's policy and practice of imposing unconstitutionally excessive fines. Without such relief, the county's unconstitutional practice will continue.

**Count III**
**(Fourteenth Amendment to the U.S. Constitution—**
**Lack of Protections for Innocent Owners)**

135.   Plaintiffs incorporate Paragraphs 1 through 116 by reference as though fully alleged in this paragraph.

136.  The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

137.  Michigan law unconstitutionally denies innocent owners due process in nuisance-abatement actions by not requiring "proof of knowledge of the existence of the nuisance on the part of 1 or more of the defendants . . . ."  MCL § 600.3815(2).  Regardless of state law, Defendant has an obligation under Section 1 of the Fourteenth Amendment to guarantee due process of law to anyone it seeks to deprive of property.

138.  Although the U.S. Supreme Court has held that MCL § 600.3815(2) does not violate the substantive due process protections of the Fourteenth Amendment, *Bennis v. Michigan*, 516 U.S. 442 (1996), it does not follow that the statute survives modern due-process analysis.

139.  Except in limited circumstances, individuals whose cars are seized and impounded for reasons other than nuisance abatement also have no ability to assert a defense of innocence to avoid payment of the redemption fee and towing and storage costs.

140.  Michigan Compiled Laws § 600.3815(2) violates the Fourteenth Amendment's procedural and substantive due process guarantees by denying any innocent-owner protections in nuisance-abatement actions.

35

141.    The county violates the Fourteenth Amendment's procedural and substantive due process guarantees by denying innocent owners any means of demonstrating their blamelessness in nuisance-abatement actions and by denying innocent owners in other types of actions any means of doing so prior to the county's initiation of civil-forfeiture proceedings.

142.    Declaratory and injunctive relief is necessary to remedy the county's unconstitutional policy and practice of failing to provide adequate protection for innocent vehicle owners.  Without such relief, the county's unconstitutional practice will continue.

### Count IV
### (Fourteenth Amendment to the U.S. Constitution— Lack of Prompt, Post-Seizure Hearing)

143.    Plaintiffs incorporate Paragraphs 1 through 116 by reference as though fully alleged in this paragraph.

144.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects the right of people to promptly be heard by a neutral judicial officer after the government seizes property.

145.    After seizing vehicles, Wayne County violates the Fourteenth Amendment's procedural guarantees by denying property owners (innocent and suspect alike) a prompt, post-seizure hearing at which the owner has an opportunity to contest the legality of the seizure before a neutral judicial

36

officer during the pendency of a civil-forfeiture or nuisance-abatement action.

146.  The county's policy or practice of failing to provide prompt post-seizure hearings to property owners violates due process.

147.  As a matter of course, the county unreasonably seizes and continues to impound vehicles before a final judgment of forfeiture has been entered.

148.  The county unreasonably deems the owner of every seized vehicle responsible for the crime that it contends subjects the vehicle to forfeiture.  County prosecutors make this self-interested determination without any judicial involvement or particularized investigation, even when the vehicle owner clearly was not involved in the alleged crime.

149.  When a property owner formally objects to a seizure, the county has a policy and practice of unreasonably delaying the initiation of civil-forfeiture proceedings against the property.  The county routinely delays six months after the initial seizure, or longer, before commencing forfeiture proceedings.

150.  In the months between seizure and this delayed civil-forfeiture proceeding, a property owner has no meaningful opportunity to be heard regarding the validity of the county's continued deprivation of property.

151.   When forfeiture proceedings begin, the county has a policy and practice of obtaining an order from a judge of the Wayne County Circuit Court ordering the property owner to appear in person for a "pre-trial conference."  Uniformly, there is no judge at this "pre-trial conference" and, instead, county prosecutors pressure the property owner to pay the "redemption fee," towing fees, and continuously accruing storage fees.

152.   If a property owner, at this stage, declines to pay the county's fines and fees, county prosecutors take no prompt action to litigate the civil-forfeiture action; instead, they continue to pressure property owners to pay the Wayne County Prosecutor's Office for the pre-trial release of their vehicles (and other property).

153.   It violates the right to due process of law under the Fourteenth Amendment to the U.S. Constitution for the county to seize and impound vehicles before a final judgment of forfeiture without providing any means for a property owner to obtain a prompt, post-seizure hearing before a judicial officer.

154.   An individual owner has a constitutionally protected property interest in retaining his vehicle (and other property inside) prior to final judgment.

155.   As the injuries to the Named Plaintiffs and class members illustrate, depriving a person of his car for the months (or even years) it takes the county to initiate civil-forfeiture or nuisance-abatement proceedings can have a devastating effect on a person's life, education, and career.

156.   A property owner's interest in continued possession and use of his vehicle is substantial.  Having access to a car is a vital tool for mobility and protection from the elements in Wayne County and, without one, vehicle owners are greatly inconvenienced, if not incapable of going to work, going to school, or interacting with others.

157.   The risk of erroneous deprivation of vehicles under the county's forfeiture program is great.  On information and belief, police officers and sheriff's deputies regularly seize vehicles based solely on their proximity to a crime or a high-crime area.

158.   Considering the revenue generated by forfeiture (or, more commonly, by settlements paid by vehicle owners), officers have a financial incentive to seize vehicles with the intent to forfeit, even where forfeiture would be inappropriate.

159.   The county's policy and practice of denying property owners a prompt, post-seizure hearing also risks forcing innocent property owners to

pay the county's "redemption fee," towing, and storage fees because there is no other rational means of expeditiously challenge a seizure.

160.   Rather than waiting the six months or longer that it takes the county to bring civil-forfeiture or nuisance-abatement proceedings, the only rational action for innocent owners is to pay the county's required fees (if that is economically possible) and get their vehicle back.

161.   By contrast, providing prompt, post-seizure hearings would provide procedural safeguards to ensure that the county's seizure and retention of property is not directed at individuals who have done nothing wrong.

162.   The costs and administrative burden of making prompt, post-seizure hearings available to property owners are reasonable considering the added value that procedural safeguard would provide.

163.   Declaratory and injunctive relief is necessary to remedy the county's unconstitutional policy and practice of denying property owners prompt post-seizure hearings.  Without such relief, the county's unconstitutional practice will continue.

**Count V**
**(Fourteenth Amendment to the U.S. Constitution—**
**Arbitrary and Irrational Fines and Fees)**

164.   Plaintiffs incorporate Paragraphs 1 through 116 by reference as though fully alleged in this paragraph.

165.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits imposition of irrational fines and fees.

166.   The county's seize-and-ransom policy irrationally requires innocent people to pay fines and fees based on the actions of others.

167.   Under its seize-and-ransom policy, the county irrationally releases vehicles (and other property) to those who can afford to pay fines and fees, regardless of the seriousness of the underlying allegations.

168.   At the same time, the county irrationally refuses to release vehicles (and other property) to those who cannot—or will not—pay the same fines and fees, regardless of the lack of seriousness of the underlying allegations.

169.   The county irrationally determines whether vehicles (and other property) should be seized and retained based, not on public safety concerns, but on whether the owner of the property pays substantial fines and fees to the county.

41

170.   The county's seize-and-ransom policy irrationally prioritizes revenue from fines and fees over both public safety and the rights of the accused and innocent owners alike.

171.   No legitimate governmental interest supports the county's seize-and-ransom policy.

172.   The county's "redemption fee" matrix is arbitrary and irrational, and no legitimate governmental interest supports it.

173.   Declaratory and injunctive relief is necessary to remedy the county's unconstitutional policy and practice of imposing arbitrary and irrational fines and fees.  Without such relief, the county's unconstitutional practice will continue.

## Count VI
### (Fourteenth Amendment to the U.S. Constitution— Lack of Adequate Notice to Property Owners)

174.   Plaintiffs incorporate Paragraphs 1 through 116 by reference as though fully alleged in this paragraph.

175.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the deprivation of property and the imposition of fines and fees without adequate procedural protections, including effective and meaningful notice to property owners.

176.   The county routinely provides inadequate notice to car owners whose cars (and other property) are seized while someone else is driving.

177.   The county provides inadequate notice to property owners that fees begin to accrue immediately upon seizure and increase with each passing day.

178.   The county's policy and practice of providing constitutionally inadequate notice to property owners who are not driving at the time of seizure means that such owners incur additional fines and fees.

179.   The county's policy and practice of providing constitutionally inadequate notice violates the procedural due process protections of the Fourteenth Amendment to the U.S. Constitution.

180.   Declaratory and injunctive relief is necessary to remedy the county's unconstitutional policy and practice of failing to provide adequate notice of seizures.  Without such relief, the county's unconstitutional practice will continue.

## Individual Claim

### Count VII
### (Plaintiff Robert Reeves's Claim for Return of Property)

181.   On his own behalf, Plaintiff Robert Reeves re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 93 above as though fully alleged in this paragraph.

182.   Robert individually brings this claim for the return of his property unconstitutionally seized and held by Defendant as set forth in Paragraphs 39 through 49 above.

183.   Robert is entitled to the immediate return of his car and its contents, including his two cell phones and $2,280 in U.S. Currency that were taken from him at the time of the seizure.

184.   Robert's property must be returned because, as described in Paragraphs 117 through 180 above, the ongoing seizure of his property violates the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

185.   Because the seizure of his property was unlawful, Robert is entitled to the return of his property under this Court's equitable powers under 28 U.S.C. § 1331 and Rule 41(g) of the Federal Rules of Criminal Procedure.

## REQUEST FOR RELIEF

WHEREFORE, Named Plaintiffs request the following relief, on behalf of themselves and all others similarly situated:

A.   An order certifying this action as a class action under Rule 23(a) and 23(b)(2)–(3) of the Federal Rules of Civil Procedure;

B.      Appointment of Named Plaintiffs as representatives of the class;

C.      Appointment of the Institute for Justice and Barton Morris as class counsel;

D.      A declaratory judgment in favor of Plaintiffs and against Defendant providing that the imposition of fines and fees on innocent owners is unconstitutional both on its face and as applied to Plaintiffs and is, therefore, void and without effect;

E.      A declaratory judgment in favor of Plaintiffs and against Defendant providing that the county's policy of requiring a car's owner to pay a "redemption fee," plus fees that accrue only because the county refuses to release the car, in order to regain possession of his vehicle is unconstitutional both on its face and as applied to Plaintiffs and is, therefore, void and without effect;

F.      A declaratory judgment in favor of Plaintiffs and against Defendant providing that Michigan Compiled Law § 600.3815(2) is unconstitutional both on its face and as applied to Plaintiffs and is, therefore, void and without effect;

G.      A permanent injunction in favor of Plaintiffs and against Defendant prohibiting Defendant or its officers or agents from

45

enforcing the county's policy and practice of unconstitutionally seizing property;

  H. A permanent injunction in favor of Plaintiffs and against Defendant prohibiting Defendant or its officers or agents from enforcing the county's policy and practice of unconstitutionally retaining property;

  I. A permanent injunction in favor of Plaintiffs and against Defendant prohibiting Defendant or its officers or agents from providing constitutionally inadequate notice to car owners whose vehicles have been seized;

  J. A permanent injunction in favor of Plaintiffs and against Defendant prohibiting Defendant or its officers or agents from imposing arbitrary and irrational fines and fees on property owners;

  K. An order or permanent injunction requiring Defendant to return Plaintiff Robert Reeves's car, cell phones, and $2,280 in U.S. currency.  In the alternative, if the car and other personal property has been disposed of or cannot be returned to Robert for any reason, a permanent injunction in favor of Plaintiff Robert Reeves and against Defendant for restitution equivalent to the value of the property on the day it was seized;

L.      A permanent injunction in favor of Plaintiffs and against Defendant requiring Defendant to return to Plaintiffs all redemption fees, towing fees, and storage fees paid by Plaintiffs;

M.      An award of compensatory damages for each of the seven claims for relief;

N.      An award of Plaintiffs' costs and expenses, together with reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

O.      Further relief as this Court may deem just and proper.

Dated: February 4, 2020                 Respectfully submitted,

                                         /s/ Wesley Hottot
Barton Morris                            Wesley Hottot
State Bar of Michigan P54701*            Washington State Bar Ass'n 47539*
Law Offices of Barton Morris            INSTITUTE FOR JUSTICE
520 North Main Street                    600 University Street, Suite 1730
Royal Oak, MI 48067                      Seattle, WA 98101
(248) 541-2600                           (206) 957-1300
barton@bartonmorris.com                  whottot@ij.org

                                         Kirby Thomas West
                                         Pennsylvania Bar Ass'n 321371*
                                         INSTITUTE FOR JUSTICE
                                         901 North Glebe Road
                                         Suite 900
                                         Arlington, VA 22203
                                         (703) 682-9320
                                         kwest@ij.org

*Attorneys for Plaintiffs*

* Admitted in the E.D. of Mich.