# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: August 31, 2023

Mr. Jaimie N. Cavanaugh
Institute for Justice
520 Nicollet Mall, Suite 550
Minneapolis, MN 55402

Mr. Wesley Patrick Hottot
Institute for Justice
600 University Street, Suite 1730
Seattle, WA 98101

Mr. Davidde A. Stella
Wayne County Corporation Counsel
500 Griswold Street, 30th Floor
Detroit, MI 48226

Ms. Kirby Thomas West
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, VA 22203

Re: Case No. 22-1262, *Melisa Ingram, et al v. Wayne County, MI*
Originating Case No. : 2:20-cv-10288

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0203p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

MELISA INGRAM; ROBERT REEVES; STEPHANIE WILSON,

                                 *Plaintiffs-Appellees*,

        *v.*

WAYNE COUNTY, MICHIGAN,

                                 *Defendant-Appellant*.

No. 22-1262

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-10288—George Caram Steeh III, District Judge.

Argued: May 4, 2023

Decided and Filed: August 31, 2023

Before: GIBBONS, BUSH, and THAPAR, Circuit Judges.

———————————

### COUNSEL

**ARGUED:** Davidde A. Stella, WAYNE COUNTY, Detroit, Michigan, for Appellant. Wesley Hottot, INSTITUTE FOR JUSTICE, Seattle, Washington, for Appellees. **ON BRIEF:** Davidde A. Stella, WAYNE COUNTY, Detroit, Michigan, for Appellant. Wesley Hottot, INSTITUTE FOR JUSTICE, Seattle, Washington, Kirby Thomas West, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellees.

        BUSH, J., delivered the opinion of the court in which GIBBONS and THAPAR, JJ., joined. THAPAR, J. (pp. 26–35), delivered a separate concurring opinion.

————————————

## OPINION

————————————

JOHN K. BUSH, Circuit Judge.  Plaintiffs allege the government of Wayne County, Michigan has a policy or practice of seizing and holding vehicles while taking months to decide whether to initiate forfeiture proceedings.  Plaintiffs claim they were not provided an opportunity to be heard about the detention of their vehicles and that this failure violates the Due Process Clause of the Fourteenth Amendment.  The district court held that plaintiffs are entitled to the requested hearing.  We agree and hold that Wayne County violated that Constitution when it seized plaintiffs' personal vehicles—which were vital to their transportation and livelihoods—with no timely process to contest the seizure.  We further hold that Wayne County was required to provide an interim hearing within two weeks to test the probable validity of the deprivation.  Accordingly, we AFFIRM and REMAND for further proceedings consistent with this opinion.

## I.

Three individuals in Detroit brought this suit under 42 U.S.C. § 1983.  They alleged that Wayne County has a policy or practice of seizing vehicles and their contents without probable cause that the property is connected to a crime.[1]  According to plaintiffs, Wayne County seizes vehicles simply because of the vehicle's location in an area generally associated with crime.  Regardless of the owner's innocence, Wayne County impounds the vehicles and its contents until the owner pays a redemption fee.  This fee is $900 for the first seizure, $1,800 for the second, and $2,700 for the third, not including other fees for towing and storage.

If the owner is unwilling or unable to pay the redemption fee, the only alternatives are either to abandon the vehicle or to wait for county prosecutors to decide whether to initiate civil forfeiture proceedings.  Before a forfeiture action is brought, there are four or more pretrial conferences involving the property owner and prosecutors, without a judge present.  During those conferences, prosecutors "attempt to persuade [the owner] to pay the redemption fee,

—————————————————

[1]Because this case is at the motion-to-dismiss stage, "[t]he facts alleged by the plaintiff must be accepted as true." *Kepley v. Lanz*, 715 F.3d 969, 974 (6th Cir. 2013) (quoting *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012)).

towing costs, and storage fees, pointing out that storage fees accrue daily." First Am. Compl., R. 12, Page ID 232. The owner must attend all conferences, for missing just one will result in automatic forfeiture and transfer of title to the county. As these conferences occur once a month, it takes at least four months, on top of any previous delays (usually an *additional* four to six months), to complete the pre-hearing requirements and finally arrive before a neutral decisionmaker. This results in a potential timeline of at least eight months from the time the vehicle was initially seized to when the owner may potentially recover it without paying a fee.

Once the owner has passed through the gauntlet of pretrial conferences, the seizure proceedings are conducted pursuant to three Michigan statutes: the Nuisance Abatement statute (Mich. Comp. Laws (M.C.L.) § 600.3801 et seq.), the Controlled Substances Act (M.C.L. § 333.7521 et seq.), and the Omnibus Forfeiture Act (M.C.L. § 600.4701 et seq.).

The Nuisance Abatement statute allows a prosecutor (or other plaintiff) to file an action to abate a nuisance, which includes a building or vehicle (and its contents) that is used "for the purpose of lewdness," for controlled substances, for brewing beverages, for armed violence, or for certain other activities. M.C.L. §§ 600.3801, 600.3805. If the government seeks abatement by forfeiture, the state court applies a clear-and-convincing standard to determine whether the property was used in furtherance of the nuisance. M.C.L. § 600.3815(4).

Michigan's Controlled Substances Act states that "a conveyance, including an aircraft, vehicle, or vessel used or intended for use, to transport, or in any manner to facilitate the transportation, for the purpose of sale or receipt" of articles including "controlled substances" is "subject to forfeiture." M.C.L. § 333.7521(1). The "plaintiff in a forfeiture action under this article has the burden of proving a violation of this article by clear and convincing evidence." *Id.* § 333.7521(2).

The Omnibus Forfeiture Act allows forfeiture of properties that are the "proceeds of a crime . . . or an instrumentality of a crime"; and, for some crimes, forfeiture of property that was used to "conceal" or "escape from" the crime. M.C.L. § 600.4702(1). However, property is not subject to seizure if "[t]he owner of the property did not have prior knowledge of, or consent to the commission of, the crime, if the lack of prior knowledge is not the result of the owner's

willful blindness." M.C.L. § 600.4702(2)(a). The plaintiff in a forfeiture proceeding must prove "by a preponderance of the evidence" that the property constitutes proceeds or an instrumentality of the crime and that a person other than the convicted individual who claims ownership had prior knowledge or consented to the crime. M.C.L. § 600.4707(6).

The generally high burden of proof imposed on the government under these statutes only applies at the forfeiture hearing itself. The statutes therefore do not protect plaintiffs from the deprivation of their properties while they await that hearing. This interim harm prompted plaintiffs here to file suit. The plaintiffs are described below.

### A. Stephanie Wilson

Stephanie Wilson, at the time the complaint was filed, was a 29-year-old single mother studying to become a nurse at Wayne County Community College. She had two vehicles seized under Michigan's Controlled Substances Act. The first seizure occurred in January 2019. Wilson drove to pick up Malcolm Smith, who is her daughter's father. As soon as Smith entered the car, Detroit officers ordered them to exit without explanation. Wilson asserts no drugs, guns, or cash were found, and no one was arrested. But Wilson's car was still seized for violating Michigan's Controlled Substance Act. The officers provided her with a notice of seizure, which required her to contact the Wayne County Prosecutor's Office in no fewer than three, and no more than twenty, business days. The following day, Wilson attempted to contact the Vehicle Seizure Unit, but the county would not speak to vehicle owners outside the provided time frame. She then visited the Unit in person four days after the seizure but was turned away because her paperwork could not be found. Two weeks later, she visited again in person, but was told it was too late to contest the seizure. So she had to abandon her vehicle. Wilson spent over a month without a car before purchasing a new one with money from her tax refund.

In June 2019, Wilson again headed out to pick up Smith. Shortly after he entered the car, Detroit police pulled Wilson over. The officers found five empty syringes in Smith's pockets, which they allowed him to keep, but found no drugs, guns, or cash and made no arrests. Nonetheless, the officers seized Wilson's car under Michigan's Controlled Substances Act. Officers told Wilson that she was "in the wrong neighborhood" and she "shouldn't be here."

First Am. Compl., R.12, Page ID 252. Officers furnished her with a notice stating the vehicle was seized for the sale, receipt, or transportation of narcotics or the facilitation of a violation of state drug laws.

Wilson was then without a car up until the time of the complaint. She was sometimes able to borrow a friend's truck or rent a truck to get around.

The county informed Wilson that she would have to pay an $1,800 redemption fee plus towing and storage fees to recover her vehicle because it was her second seizure. She was told she would have a hearing on July 10, 2019, but it was never set. Wilson called the Vehicle Seizure Unit multiple times throughout the next four months but was repeatedly told that she needed to wait for the county to initiate forfeiture proceedings against her car to contest the county's possession of it. In October, the county finally filed a forfeiture complaint. The Wayne County Prosecutor's Office ordered Wilson to appear at a pretrial conference in November with only prosecutors present. At that conference prosecutors pressured her to pay the $1,800 and warned it could be four months before a judicial hearing. At a second pretrial conference in February 2020, she told prosecutors she did not have the money to pay the redemption fee, and prosecutors offered to waive towing and storage fees if she could return with a "reasonable amount of money." *Id.* at Page ID 254. Wilson insisted on the hearing, and two similar pretrial conferences ensued. At the time of the complaint, Wilson was still waiting for a judicial hearing and never had the opportunity to speak with a judge.

### B. Robert Reeves

As of the date of the complaint, then 29-year-old Robert Reeves lived with his wife and their five children and worked in construction and car repairs. In early 2019, he purchased a 1991 Chevrolet Camaro and spent more than $9,000 improving it, hoping to sell it at a profit and start another car project. In July, a coworker asked Reeves to visit a job site where he was clearing rubbish, requesting instruction on how to operate a skid-steer loader he had at the site. Reeves taught him how to use it, and the two planned to meet the next day to start the project.

Reeves then went to buy a bottle of water at a gas station, where officers surrounded him to ask about a stolen skid-steer. Reeves thought the skid-steer was rented, as he was aware of his

coworker's rental paperwork. After several hours of detention, the officers allowed Reeves to leave, but they seized his Camaro, two cell phones, and the $2,280 from his pocket under the Omnibus Forfeiture Act. The officers did not arrest Reeves and only briefly arrested the coworker for an alleged parole violation.

More than six months later, Reeves still had not been given the opportunity to contest the seizure and no forfeiture action had been filed. He had repeatedly called the county using the phone number on the seizure notice but was told to hire an attorney to proceed further. He did so, but employees of the Vehicle Seizure Unit and Wayne County Prosecutor's Office refused to take his or his attorney's calls. He then filed the original complaint for his case in federal court. The following day, the Wayne County Prosecutor's Office agreed to release the property. On February 19, 2020, the state police sent Reeves a check in an amount equivalent to the cash seized and on February 20, 2020, Reeves recovered his car after paying $100 at the impound lot.

Reeves was later arrested for possession of stolen property and released on bond. A state court dismissed the charges for lack of probable cause. Prosecutors then refiled charges. The state court again dismissed the charges. *See* Kara Berg, *Lawsuit: Wayne County Prosecutors Retaliated Against Man After Civil Forfeiture Lawsuit*, THE DETROIT NEWS (Mar. 9, 2023, 3:59 p.m.), https://perma.cc/WCN4-25ZH.

### C.   Melisa Ingram

Melisa Ingram was a 50-year-old woman as of the date of the complaint. She worked at Blue Cross/Blue Shield in downtown Detroit as the team leader for insurance adjustors. Her 2017 Ford Fusion was seized by Wayne County officers twice.

In November 2018, she loaned her car to her then-boyfriend, Edland Turner. Suspecting he drove around in search of paid sex, Wayne County officers seized the car when Turner was the driver but made no arrests. The car was seized under Michigan's Nuisance Abatement Statute. The officers gave Turner a Notice of Seizure, which he gave to Ingram. Per the instructions on the notice, Ingram went to the Vehicle Seizure Unit several times, but when she was told she would have to wait at least four months to see a judge, she paid the $900 redemption fee and $455 in other fees to release her car.

In June 2019, Ingram again loaned her vehicle to Turner so that he could attend a friend's barbeque.  After this event the same two officers pulled Turner over.  Officers say they stopped him because he had just attended a barbeque at a home connected with drugs or sex work.  They then seized the vehicle under the Nuisance Abatement statute; one of the deputies drove off with the vehicle, with Ingram's belongings inside.  Because this was the second seizure, Ingram would have had to pay $1,800 to release the vehicle, not including other fees.

This seizure compounded Ingram's financial problems; she had already filed for bankruptcy as a result of paying the redemption fee following the first seizure and could not afford to pay $1800 plus fees.  Therefore, she surrendered her interest in the car to the lien holder, Ford Motor Credit.  Although Ingram informed the county of this formal surrender of interest, the Wayne County Prosecutor's Office filed a civil complaint to initiate forfeiture proceedings that improperly named Ingram as the claimant.  Ingram then had to retain an attorney to file an answer within twenty days or risk losing the vehicle by default and failing in her obligations to her creditor in violation of the bankruptcy court's orders.  After seven months of in-person and written requests, the county finally fixed its error, named Ford as the claimant, and allowed Ingram to retrieve her personal belongings.

D.  Procedural History

All three claimants sought relief in federal court.  They brought claims under the Fourth Amendment for unreasonable seizure and unreasonable retention, the Eighth Amendment for excessive fines, and the Fourteenth Amendment for (1) lack of protections for innocent owners, (2) the lack of a prompt, post-seizure hearing, (3) arbitrary and irrational fines and fees, and (4) lack of adequate notice.  They also sought damages, an injunction enjoining Wayne County from unconstitutionally seizing and impounding property and providing constitutionally defective notice, and, where relevant, return of property.  And they sought to form a class that they would represent.

On July 1, 2020, Wayne County filed three motions to dismiss, one for each plaintiff.  After briefing, the district court granted the motions in part and denied the motions in part.

Relevant here is Count IV, under which the district court evaluated the need for a prompt, post-seizure hearing under *Mathews v. Eldridge*, 424 U.S. 319 (1976). The *Mathews* test evaluates the provided process based on three factors: (1) "the degree of potential deprivation that may be created by a particular decision," (2) the "fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards," and (3) the public interest. 414 U.S. at 341, 343, 346.

Relying on *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002), and this Court's unpublished decision in *Nichols v. Wayne County*, 822 F. App'x 445 (6th Cir. 2020), the district court concluded that plaintiffs had adequately alleged a due process violation. Under the first *Mathews* factor, the private interest, the district court noted the core importance of one's personal vehicle in today's society and the increased harm resulting from a longer deprivation. As to the second factor, the district court concluded that in light of the complexity of a probable cause determination required for each of the statutes at issue, there was a high risk of erroneous deprivation, particularly for innocent vehicle owners who were absent at the time of seizure. And a later forfeiture hearing could not remedy the ongoing loss from a deprivation of one's vehicle (whereas a prompt hearing might). Under the third factor, the government's interest, the district court noted that the county did not articulate its interest in retaining cars before the forfeiture hearing. Filling in some possible interests that the county failed to provide, the court noted that there was little interest here in protecting against crime because "neither of the alleged crimes for which Plaintiffs' cars were seized are tied to or dependent on the use of a vehicle." Order, R.54, Page ID 1018. But because of the "additional administrative burden" of adding a hearing, the district court weighed this factor slightly in favor of the county. *Id.*

Summing the factors, the district court concluded that "a post-seizure and pre-forfeiture judgment hearing is required due process." *Id.* at Page ID 1018-19. It denied defendants' motion to dismiss Count IV.

At the end of its order, the district court certified for interlocutory appeal its ruling on Count IV under 18 U.S.C. § 1292(b).[2]  It concluded that certification was warranted because "the Sixth Circuit had yet to rule on whether a prompt post-seizure, pre-forfeiture judgment hearing is required under the Fourteenth Amendment Due Process Clause."  Order, R.54, PageID 1024-25.  A motions panel granted the defendants permission to appeal Count IV.  *In re Wayne Cnty.*, No. 21-0106/0107, 2022 U.S. App. LEXIS 8730, at *3–*5 (6th Cir. Mar. 31, 2022).  The panel explained:

> In certifying the Count IV issue, the district court described whether a vehicle's owner is entitled to a prompt postseizure, pre-forfeiture hearing as "an open question."  In *Nichols v. Wayne County*, we recognized that due process requires "notice and a timely post-seizure [hearing] prior to forfeiture," but did not have occasion to answer "the only constitutional question remaining," namely what qualifies as "timely."   Because this question's "correct resolution is not substantially guided by previous decisions," it presents a substantial ground for difference of opinion.

*Id.* at *3–*4 (citations omitted).

## II.

Where a district court denies a motion to dismiss based on a conclusion that the plaintiff has adequately pleaded a legal claim, we review that decision de novo.  *Mich. Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 865 (6th Cir. 2000) (citing *Barrett v. Harrington*, 130 F.3d 246, 251 (6th Cir. 1997)).  On interlocutory review, the standard is the same.  *See id.*; *Hicks v. State Farm Fire & Cas. Co.*, 751 F. App'x 703, 706 (6th Cir. 2018) (citing *Caruana v. Gen. Motors Corp.*, 204 F. App'x 511, 512 (6th Cir. 2006)); *LWD PRP Group v. Alcan Corp.*, 600 F. App'x 357, 362 (6th Cir. 2015).  The paramount question is whether the plaintiffs have "allege[d] facts that if accepted as true, are sufficient to state a claim to relief that is plausible on its face."  *Majestic Bldg. Maint., Inc. v. Huntington Bancshares, Inc.*, 864 F.3d 455, 458 (6th Cir. 2017) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In this analysis, "[t]he complaint is viewed in the light most favorable to [the plaintiffs]; the allegations in the complaint are

---

[2]The district court also certified for interlocutory appeal its dismissal of Count II.  However, because a motions panel did not grant the plaintiff's petition to appeal Count II, this opinion does not concern that issue.  *See In re Wayne Cnty.*, 2022 U.S. App. LEXIS 8730, at *5.

accepted as true, and all reasonable inferences are drawn in [the plaintiffs'] favor." *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017) (quoting *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016)).

III.

Wayne County aims to introduce various procedural objections to Count IV that were not certified for interlocutory review. Specifically, the County seeks to raise waiver, preclusion by settlement agreement, lack of standing, failure to invoke Michigan state procedures, and other reasons to dismiss.

Appellate courts are often faced with deciding what issues are within the scope of review. Bryan Lammon, *Finality, Appealability, and the Scope of Interlocutory Review*, 93 Wash. L. Rev. 1809, 1844 (2018) (citing 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure §§ 3940–3944 (3d ed. 2008)). This question is easy for final judgments: courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts of the United States," 28 U.S.C. § 1291, and may address the issues implicated by the final judgment. A party is generally "entitled to a single appeal, to be deferred until final judgment has been entered." *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)). On the other hand, "piecemeal, prejudgment" appeals undermine judicial efficiency and encroach on the work of district judges. *Id.* (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981)).

However, 28 U.S.C. § 1292 allows for interlocutory review in specific situations, thereby allowing cabined departure from the final judgment rule—a "safety valve[]." *In re Somberg*, 31 F.4th 1006, 1008 (6th Cir. 2022) (quoting *Page Plus of Atlanta v. Owl Wireless, LLC,* 733 F>3d 658, 659-60 (6th Cir. 2013)). Relevant here, discretionary interlocutory appeals are permitted:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. . . . The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within

ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).  Therefore, a district court and court of appeals must both find value in an interlocutory appeal based on whether there is a (1) controlling question of law (2) as to which there is substantial ground for difference of opinion, where (3) immediate appeal would materially advance the termination of the litigation.  *See id.*; *see also Somberg*, 31 F.4th at 1008 (quoting § 1292(b)).  "Review under § 1292(b) is granted sparingly and only in exceptional cases."  *In re City of Memphis*, 293 F.3d 345, 350 (6th Cir. 2002) (citing *Kraus v. Bd. of Cnty. Rd. Comm'rs*, 364 F.2d 919, 922 (6th Cir. 1966)).

What is the scope of an interlocutory appeal?  Section 1292(b) allows "immediate appeal from the order," rather than of an issue per se.  In *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996), the Supreme Court explained that § 1292(b) provides jurisdiction over orders, rather than as to specific questions certified by a district court.  *Id.* at 205.  So while an appellate court "may not reach beyond the certified order," it "may address any issue fairly included within the certified order."  *Id.*; *see also William Powell Co. v. Nat'l Indem. Co.*, 18 F.4th 856, 874 (6th Cir. 2021).

But what is an order?  In *Little v. Louisville Gas & Electric Co.*, 805 F.3d 695 (6th Cir. 2015), we interpreted "order" as stated in § 1292(b) as a "direction or command resolving a discrete motion or claim."  805 F.3d at 700.  *Little* also acknowledged that, under *Yamaha* and similar case law, a district court's certification of an order with a controlling legal issue can still permit appellate consideration of other legal questions within the order.  *Id.* at 699.  However, it distinguished between legal questions implicated by a district court's order—permitted for appellate consideration—and "additional orders that are included in one document that happens to be labeled 'order'"—which are not.  *Id.*; *accord Homeland Stores, Inc. v. Resolution Tr. Corp.*, 17 F.3d 1269, 1271–72 (10th Cir. 1994); *FDIC v. Dye*, 642 F.2d 833, 837 n.6 (5th Cir. Unit B Apr. 1981).  The holding in *Little* is consistent with the intent behind § 1292(b).  Because district court "orders" may be large documents resolving numerous disparate issues about a case, it would make little sense for an interlocutory appeal under § 1292(b) to permit appellate consideration of anything within the district court decision—which could undermine the final

judgment rule. And review under this provision is supposed to be "exceptional." *In re City of Memphis*, 293 F.3d at 350.

Here, the district court certified for appellate review its denial of the motions to dismiss Count IV because of the "open question" regarding the timeliness of a prompt post-seizure, pre-forfeiture hearing. Order, R.54, Page ID 1011. Under *Yamaha* and *Little,* then, we likely have discretion to review other legal questions involving Count IV.

But just because we can does not mean we should. None of the extra issues Wayne County invokes on appeal regarding Count IV are easily resolved: lack of standing, assertions of claims being barred by settlement agreements, etc. Some of the issues Wayne County raises are not even included in the district court order at issue. *See, e.g.*, Appellant's Br. at 42, 52. Nor are these issues dispositive of the courts' jurisdiction—which would force us to consider them. In its briefs, Wayne County challenges plaintiffs' standing only with respect to prospective relief, and it admitted at oral argument that it was not challenging plaintiffs' standing to sue for damages. Regardless, plaintiffs undoubtedly have standing to sue for damages and those claims require us to resolve the same issues as their claims for prospective relief.

All told, interlocutory review is exceptional, and it was granted, ostensibly, to address a "'controlling question of law' the prompt resolution of which 'may materially advance the ultimate termination of the litigation.'" *Mohawk*, 558 U.S. at 110–11 (quoting 28 U.S.C. § 1292(b)). Without seeing "the chance that the litigation at hand might be speeded, or a 'particular injustice[e]' averted," *Digit. Equip.*, 511 U.S. at 868, we will not tread on the district court's other work at this early juncture. *See id.* at 106 (citing *Firestone*, 449 U.S. at 368). After the district court renders a decision in due course, this court will have jurisdiction over any appeals under the final judgment rule.

We now turn to the Fourteenth Amendment claim of Count IV.

## IV.

Plaintiffs claim that Wayne County's failure to provide a timely post-seizure hearing violated their procedural rights under the Fourteenth Amendment's Due Process Clause.

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914) (citing *Louisville & Nashville R.R. Co. v. Schmidt*, 177 U.S. 230, 236 (1900)). "[W]herever one is assailed in his person or his property, there he may defend." *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971) (quoting *Windsor v. McVeigh*, 93 U.S. 274, 277 (1876)).

The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it" via "some form of hearing." *Mathews v. Eldridge*, 424 U.S. 319, 333, 348 (1976). "The State's obligations under the Fourteenth Amendment are not simply generalized ones." *Boddie*, 401 U.S. at 380. Rather, they require procedures "tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard' . . . to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349 (quoting *Goldberg*, 397 U.S. 254, 268–69 (1970)). Often, as in *Goldberg* and *Mathews*, the question is whether a hearing is required before a property deprivation, or whether other process is sufficient. But many types of property, such as a vehicle, do not require a pre-deprivation hearing—at least so long as that deprivation is temporary. *United States v. Von Neumann*, 474 U.S. 242, 251 (1986); *Ross v. Duggan*, 402 F.3d 575, 583–84 (6th Cir. 2004). "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988) (citing *Barry v. Barchi*, 443 U.S. 55, 64–66 (1979)).

The question presented on appeal is whether due process requires a timely post-seizure hearing to determine the validity of the government's continued retention of the property before forfeiture is finally adjudicated. We apply these principles based on history, tradition, and case law relevant to the Fourteenth Amendment's Due Process Clause.

History and Tradition

Plaintiffs are not the first to complain about the warrantless seizures of property without timely post-seizure adjudication of the government's entitlement to the property. The issue came

up in old English law, which "provided for statutory forfeitures of offending object used in violation of the customs and revenue laws." *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 682–83 (1974). Under the common law of the Exchequer, "[i]f there be a seizure made, the Officer must in the next Term, or sooner, at the Discretion of the Court, return the Cause of Seizure, and take out a Writ of Appraisement." Sir Goeffrey Gilbert, Treatise on the Court of Exchequer 182 (London, H. Lintot 1758). But if the Crown delayed in returning a cause-of-seizure or taking out a writ-of-appraisement, the owner of the seized property was "entitled to move for a Writ of Delivery" for the court to mandate the return of the seized property. *See id.* at 182. Once a cause-of-seizure and writ-of-appraisement were filed, the Crown then had to file an "information" explaining why the King was entitled to a ruling "in his favor" as to seizure of the property. James Manning, Practice of the Court of Exchequer 142 (London, A. Strahn 1827). If the Crown did not make these filings "in a month" after the owner filed his claim to the property, then the owner was entitled to renew his motion for a writ of delivery, "which he might . . . have as a matter of course upon giving security." *Id.* at 162–63.

English forfeiture tradition carried over to American jurisprudence. "[A]lmost immediately after adoption of the Constitution, ships and cargoes involved in customs offenses were made subject to forfeiture under federal law, as were vessels used to deliver slaves to foreign countries, and somewhat later those used to deliver slaves to this country." *Calero-Toledo*, 416 U.S. at 683. Forfeiture actions were filed in federal district courts, which had exclusive jurisdiction to adjudicate "all seizures under laws of impost, navigation or trade of the United States" and "all suits for penalties and forfeitures incurred, under the laws of the United States." Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77; *see* Kevin Arlyck, *The Founders' Forfeiture*, 119 Colum. L Rev. 1449, 1469 n.123 (2019). But sometimes the government delayed commencement and prosecution of forfeiture actions—like what plaintiffs allege happened to them.

Unlike plaintiffs here, property owners in the early American Republic had two avenues of recourse against the government. First, they could obtain a judicial order compelling the government to bring the forfeiture suit if it wished to retain the property. As Chief Justice Marshall stated in *Slocum v. Mayberry*, 15 U.S. 1 (1817), "If the seizing officer should refuse to

institute proceedings to ascertain the forfeiture, the district court may, upon the application of the aggrieved party, compel the officer to proceed to adjudication, or to abandon the seizure." *Id.* at 10.

Second, under the Remission Act of 1790, the property owner could petition the Secretary of the Treasury to have the forfeiture remitted in whole or in part, "upon such terms or conditions as he may deem reasonable and just," provided that the forfeiture did not result from "wilful [sic] negligence or any intention of fraud." *See* Act of May 26, 1790, ch. 12, § 1, 1 Stat. 122, 122–23 (repealed 1797); *Calero-Toledo*, 416 U.S. at 689 n.27. Congress enacted the Remission Act after lobbying from Alexander Hamilton, the first Secretary of the Treasury, who reported to the House of Representatives "instances which have come under his notice, in which considerable forfeitures have been incurred, manifestly through inadvertence and want of information." *Report on the Petition of Christopher Saddler, 19 January 1790*, *Founders Online*, National Archives, https://founders.archives.gov/documents/Hamilton/01-06-02-0089. [Original source: *The Papers of Alexander Hamilton*, vol. 6, December 1789–August 1790 191–92, New York: Columbia University Press (Harold C. Syrett, ed., 1962)]. These circumstances, Hamilton argued, "indicate the necessity, in conformity to the usual policy of Commercial Nations, of vesting somewhere a discretionary power of granting relief." *Id.*

The early federal remission process essentially provided "an alternative mechanism for contesting government seizures," and "in most cases a claimant filed a petition immediately after the government filed suit." Arlyck, *supra*, at 1485. The court proceedings were "stayed pending Treasury's disposition of the petition (though generally without entry of a formal stay)." *Id.* Through the administrative proceeding, property owners could obtain earlier relief than what might be available through the courts. *See id.* ("[N]othing in the [Remission Act] required a claimant to wait until judgment in court against them to file a petition."). And the remission process had teeth: the Treasury Secretary's remission power served essentially "as a constitutional safety valve," given the "very high rate of success for remission petitions." *Id. at* 1514.

These protections of property owners' rights in federal forfeiture proceedings were in place by the time the Fifth Amendment was ratified in 1791. The procedural framework for

early forfeiture actions, therefore, provides evidence of the process that the ratification generation understood to apply to forfeiture of property under the Fifth Amendment's Due Process Clause: "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law," U.S. Const. amend. V. *See generally New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022) (noting that a "focus on history . . . comports with how we assess many . . . constitutional claims"). Likewise, history and tradition are relevant for our interpretation of the Fourteenth Amendment's Due Process Clause, which applies to the States and uses language that is parallel to the Fifth Amendment's due process guarantee: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV.

This history and tradition suggest that the constitutional adopters and ratifiers understood due process to encompass the principle that property owners have recourse when the government drags its heels in a forfeiture action. Indeed, many of the same members of Congress who proposed the Fifth Amendment also enacted statutory protection for property owners' rights prior to the final determination of forfeiture disputes. But history and tradition do not fully answer the issue presented in this appeal—namely, does due process require a timely post-seizure hearing to determine the validity of the government's continued retention of the property before forfeiture is finally adjudicated? That issue we address below based on relevant case law.

Due Process Standard

Wayne County officials, as they are alleged in the complaint to have acted, are no Alexander Hamiltons. But, accepting as true the allegations of the complaint (as it must at this stage of the proceedings), Wayne County contends that its alleged forfeiture practices comply with due process. The parties' first disagreement is about the proper standard to apply to determine the timeliness of an interim hearing under the Fourteenth Amendment. Wayne County argues for the application of *Barker v. Wingo*, 407 U.S. 514 (1972), while plaintiffs argue for *Mathews*, as employed by the district court.

Wayne County argues we should follow the "speedy-trial test" in *Barker*. *Barker* involved a defendant who was not tried for murder until more than five years after his arrest.

407 U.S. at 514. Prosecutors obtained sixteen continuances of Barker's trial in order to try a putative co-conspirator, with the hope of unearthing evidence that would help convict Barker. *Id.* at 515. Barker began objecting at the twelfth continuance by moving to dismiss the indictment. *Id.* at 517. The Supreme Court acknowledged the speedy-trial right is "slippery," *id.* at 522, in that it involves multiple interests and incentives. Although this right belongs to the defendant, a speedy trial is in society's interests in order to avoid the risk of people awaiting trial committing further crimes, to avoid judicial backlogs, and to mitigate any detrimental effect on rehabilitation stemming from delay between arrest and punishment. *Id.* at 519–20. And a slow trial may help a defendant as witnesses become unavailable and memories fade. *Id.* at 521. But not always—an innocent defendant may be kept in jail, and a defendant may be prejudiced by the delay. *Id.* An incarcerated defendant may also have trouble gathering evidence or contacting witnesses. *Id.* at 533. Based on these considerations, the Court adopted a balancing test for speedy trial cases that weaved together the "length of the delay, the reason for the delay, the defendant's assertion of his right [forceful vs. gentle], and prejudice to the defendant." *Id.* at 530. The *Barker* test is not about the value of additional process, but to "identify some of the factors which courts should assess in determining whether a particular defendant has been deprived" of the speedy-trial right based on a delay. *Id.* at 529.

To support the use of *Barker*, Wayne County points to Judge McKeague's concurrence in *Nichols v. Wayne County*, 822 F. App'x 445 (6th Cir. 2020). In *Nichols*, the majority considered *Mathews* applicable in the property forfeiture context although it declined to directly address the issue of the timeliness of a forfeiture hearing. 822 F. App'x at 449. In separate writing, Judge McKeague concluded that the proper standard was *Barker*. Relying on *United States v. Von Neumann*, 474 U.S. 242 (1986), Judge McKeague stated that a forfeiture proceeding itself— without a preliminary hearing—satisfies due process based on the speedy-trial right under *Barker*. *Id.* at 455. *Von Neumann*, in turn, held that the *Barker* test applied to a challenge to a 36-day delay by the United States Customs Service to respond to an administrative petition to return a seized vehicle. 474 U.S. at 243.

But the claim in *Von Neumann* was fundamentally about an administrative agency's slow process, and the Supreme Court noted that the process was unnecessary to a forfeiture

determination and not part of the constitutionally required process for a deprivation of property. *Id.* at 250. In addition, *Von Neumann* concerned the length of time for a final disposition, rather than the need for an interim hearing.[3]  *See id.* at 250 ("It is abundantly clear on the record in this case that . . . any due process requirement of timely disposition was more than adequately provided here."). The Supreme Court's later case *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993), however, applied *Mathews* to assess whether a state could effect an interim deprivation of real property without a hearing.

Plaintiffs argue for application of the *Mathews* test. They state that all but one circuit applies *Mathews* to evaluate the need for an interim hearing prior to final judgment. Appellees' Br. at 9 (collecting cases from the Second, Fifth, Seventh, Eighth, Ninth, and Eleventh Circuits). *Mathews* involved a constitutional challenge to the sufficiency of a written response process, and lack of a pre-termination hearing, before the suspension of federal disability benefits. 424 U.S. at 324. While the government asserted that the administrative procedures were sufficient, the plaintiff sought an evidentiary hearing at which he could be heard—and not merely *after* a reconsideration (let alone after the final decision), as was the case for the regime. *Id.* at 332–33, 338. The Supreme Court thus outlined a three-part test for assessing the "validity of any administrative decisionmaking process" under the Due Process Clause involving the private interest, the fairness and reliability and the probable value of additional procedure, and the public interest. *Id.* at 341–42, 346.

*Mathews* is the better fit for this circumstance. We have already considered *Mathews* applicable in the property forfeiture context in an unpublished decision without directly addressing the issue of its applicability. *See Nichols*, 822 F. App'x at 449 ("When state or local governments attempt to deprive an individual of his property, the Due Process Clause guarantees him an 'opportunity to be heard' in 'some form of hearing' 'at a meaningful time and in a meaningful manner'") (quoting *Mathews*, 424 U.S. at 333). Further, most circuits agree *Mathews* is the proper test. *See Krimstock v. Kelly*, 306 F.3d 40, 52 n.12, 60 (2d Cir. 2002) (Sotomayor, J.); *Serrano v. Customs & Border Patrol*, 975 F.3d 488, 496–97, 500 n.17 (5th Cir.

---

[3]As an interim step, the federal government returned the car on bond after fourteen days, even as it took thirty-six days to respond to the administrative petition. 474 U.S. at 250–51.

2020); *Smith v. City of Chicago*, 524 F.3d 834, 836 (7th Cir. 2008), *vacated as moot, Alvarez v. Smith,* 558 U.S. 87 (2009); *Booker v. City of Saint Paul*, 762 F.3d 730, 734 (8th Cir. 2014); *United States v. One 1971 BMW*, 652 F.2d 817, 820–21 (9th Cir. 1981); *but see Gonzales v. Rivkind*, 858 F.2d 657, 661 (11th Cir. 1988).

Additionally, plaintiffs do not ask for the ultimate forfeiture hearing to be conducted earlier, but for additional, interim process related to the seizure and the resulting possession of their vehicles by Wayne County. *Mathews* lays out the factors germane to whether more process is needed for the interim holding of property, whereas *Barker* assesses the validity of delays— yet plaintiffs are not strictly challenging a delay. *Barker* is also not a good fit for this type of analysis because of its entanglement with the "vague" and "slippery" speedy-trial right. 407 U.S. at 521–22. While delays may benefit a criminal defendant, Wayne County's possession of the plaintiffs' vehicles is undoubtedly harmful to them. And it is not clear how factors about the reason for a delay or the length of a delay would factor into a categorical analysis of whether a hearing or other process is needed to possess plaintiffs' vehicles. We therefore adopt the *Mathews* framework.

A. *Mathews* Analysis

Under *Mathews*, we examine (1) "the degree of potential deprivation that may be created by a particular decision," (2) the "fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards," and (3) the public interest. 424 U.S. at 341–42, 346. Our circuit requires "notice and a timely *post-seizure* opportunity to be heard prior to forfeiture." *Ross*, 402 F.3d at 583–84; *see also Nichols*, 822 F. App'x at 450. But this court has not definitively resolved whether an interim hearing is needed, given the long delay before forfeiture proceedings.

The closest Sixth Circuit precedent is *Nichols*. In that case, an officer seized Stephen Nichols's car based on suspected identity theft, and, after prosecutors failed to started forfeiture proceedings, he eventually recovered it and sued under 42 U.S.C. § 1983 and the Due Process Clause. 822 F. App'x at 446. In a fractured opinion, the panel affirmed dismissal of the

complaint.[4]  Judges Larsen and Moore separately indicated that Nichols was entitled to "some sort of retention hearing." *Id.* at 450–51, 465.  Judge Larsen wrote that the court did not have to answer the constitutional question of "how quick would be quick enough" for a prompt post-seizure retention hearing because the complaint failed under *Monell*.  *Id.* at 451.  And, although Judge Moore dissented on a different issue, she expressed that she would follow the Second Circuit's opinion in *Krimstock* holding that the failure to provide a retention hearing for owners of seizure property violated the Constitution.  *Id.* at 465 (citing *Krimstock*, 306 F.3d at 44).

The analysis from *Krimstock* is even more instructive, as the Second Circuit directly addressed the constitutional question at issue here.  In that case, plaintiffs' vehicles were seized pursuant to allegations of driving under the influence.  306 F.3d at 45–46.  They alleged procedural due process violations from the lack of a post-seizure hearing to assess probable cause for the interim holding of plaintiffs' vehicles.  *Id.* at 47.  The Second Circuit determined that the "intermediate deprivation" lasting months to sometimes years "without any prompt hearing before a neutral fact-finder" was constitutionally infirm.  *Id.* at 48.  As a preliminary matter, the *Krimstock* court explained that the seizure and later forfeiture are separate deprivations, *id.* at 50, and that the temporary nature of the seizure does not affect whether it is a deprivation, *id.* at 52; *see Fuentes v. Shevin*, 407 U.S. 67, 97 (1972) ("It is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment.").

As to the first *Mathews* factor, the Second Circuit explained that motor vehicles are a mode of transportation, sometimes the means to earn a livelihood, and often a person's "most valuable possession."  *Krimstock*, 306 F.3d at 61 (quoting *Lee v. Thornton*, 538 F.2d 27, 32 (2d Cir. 1976)).  Next, the court weighed the second factor in favor of the city because of its assumption that officers can often accurately detect people's intoxication levels, which reduced the odds of an erroneous deprivation.  *Id.* at 62–64.  But the court expressed concern that the city's warrantless seizure of vehicles would still cause erroneous deprivations, especially against innocent owners, and it highlighted the pecuniary interest in seizure that might bias officers toward taking property and the lack of remedies for people whose vehicles were erroneously

---

[4]Because the opinion was fractured with three opinions, the reason for affirmance is unclear.

seized. *Id.* at 62–63. Lastly, the court did not find a strong public interest in holding the vehicles. Seizing a car only prevents allegedly wrongful conduct in *that* car, and it does not account for people who attain sobriety nor for innocent owners who glean "indispensable benefits of daily access to their vehicles." *Id.* at 66. Summing the factors, the court concluded that the Due Process Clause requires "an early opportunity to test the probable validity of further deprivation." *Id.* at 68.

In light of this persuasive authority, we now turn to the application of the *Mathews* factors in this case, starting with the private interest. Plaintiffs allege they were forced to wait *at least* four to six months to challenge Wayne County's possession of their vehicles plus four more months for pretrial conferences—a long time to be without something that "occup[ies] a central place in the lives of most Americans." *Coleman*, 40 F.3d at 260. Wilson lost one vehicle entirely in the labyrinth of procedures, and Wayne County possessed her next vehicle for one year. Reeves's vehicle was seized and held starting July 2019 through February 2020. Wayne County seized Ingram's vehicle twice. After the first seizure, she was told it would be "at least four months" before her case could come before a judge, which led her to pay $1,355 in fees to reclaim the vehicle. The city's practices pushed Ingram into bankruptcy, leading her to surrender her vehicle to a creditor after the second seizure. In contrast with these lengthy time frames, courts have found procedural due process violations for depriving people of their vehicles sans hearing for three weeks to two months, *Krimstock*, 306 F.3d at 54, one week, *Coleman*, 40 F.3d at 262, and 97 to 142 days, *Smith*, 524 F.3d at 835–36. In light of these analogous examples, the deprivation to the plaintiffs is substantial.

As to the risk of erroneous deprivation, there is little in terms of process to ensure seizures occur only for vehicles that are linked with a crime or public nuisance. All plaintiffs allege that the seizures were arbitrary and not born of considered judgment. Unlike the breathalyzer and blood tests used in *Krimstock*, the ad hoc seizure of vehicles based on proximity to areas where a crime may have occurred presents a high risk of erroneous deprivation, without any similar assumption that officers can accurately predict culpability.

Finally, the government's interest here is anything but weighty. Although Wayne County ostensibly seized the vehicles because of reasons related to health, safety, and/or drugs, the

record suggests otherwise—that the county seized the vehicles in order to obtain proceeds from fees. If Wilson's vehicle had a dangerous connection with drugs, it is unclear why the county promptly released the vehicle after a payment of $1,355. And if Ingram's vehicle was a public nuisance, the county's willingness to release the vehicle for $1,800 suggests it is more interested in the money than in remedying a public nuisance. While an additional hearing could add some administrative burden, it may obviate the need for forfeiture proceedings down the line by eliminating spurious use of forfeiture proceedings, pretrial conferences, and other processes. Therefore, it may alleviate the complex administrative process that property owners navigate to retrieve their vehicles in Detroit.

In sum, all three factors favor plaintiffs. They have easily met the bar to survive a motion to dismiss with respect to the single issue before us. We therefore hold, under our reading of the due process clause, that Wayne County was required to provide a prompt post-seizure hearing for plaintiffs' personal vehicles.

V.

Still, we are left with the question of what constitutes a timely hearing prior to final disposition of the forfeiture proceeding. We need not answer this question per se. But at the same time, because of the large time gap between seizure and a hearing in Wayne County, holding that a hearing was required under these facts would not give much guidance to district courts. While we have the question before us, we find it prudent to offer some guidance on what would be "timely."

"[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. [D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (citation omitted). Therefore, in defining "timely," we must remember due process is somewhat fact dependent.

In this case, all three plaintiffs lost their personal vehicles used for transportation. As such, requiring a post-seizure hearing within a short time frame may be justified because a personal vehicle used for transportation is almost as precious as a home. As the Seventh Circuit

No. 22-1262        *Ingram v. Wayne County, Mich.*        Page 23

has described, "Our society is, for good or not, highly dependent on the automobile. The hardship posed by the loss of one's means of transportation, even in a city like Chicago, with a well-developed mass transportation system, is hard to calculate. It can result in missed doctor's appointments, missed school, and perhaps most significant of all, loss of employment." *Smith*, 524 F.3d at 838; *see also Coleman*, 40 F.3d at 260–61 ("Automobiles occupy a central place in the lives of most Americans, providing access to jobs, schools, and recreation as well as to the daily necessities of life."). A vehicle is often one's "most valuable possession." *Krimstock*, 306 F.3d at 61. As discussed above, pre-hearing deprivations of seized vehicles have been deemed excessive after only a relatively short period, including as little as one week. *See Coleman*, 40 F.3d at 257; *Krimstock*, 306 F.3d at 54; *Smith*, 524 F.3d at 835–36.

We also turn to Fourth Amendment cases for guidance. When a person loses a personal vehicle needed for transportation, there is an associated loss of liberty. *Krimstock*, 306 F.3d at 61 (quoting Robert H. Jackson, *The Task of Maintaining Our Liberties: The Role of the Judiciary*, 39 A.B.A.J. 961, 963 (1953)); *see Coleman*, 40 F.3d at 260–61. A line of cases dating back to *Gerstein v. Pugh*, 420 U.S. 103 (1975), has expounded on the need for an opportunity to be heard when someone who has suffered the greatest loss of liberty—being in government custody.[5] In *Gerstein*, the Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause for detention. *Id.* at 126. Although four justices would have applied the Due Process Clause, the majority noted that the "Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' . . . in criminal cases." *Id.* at 125 n.27; *see also Manuel v. City of Joliet*, 580 U.S. 357, 364–69 (2017) (walking through the Fourth Amendment-due process distinction and reiterating that "the Fourth Amendment governs a claim for unlawful pretrial detention").

Later, in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), the Supreme Court was tasked with defining "prompt" for the purpose of a *Gerstein* hearing. *Id.* at 47. The majority expressed that "we hesitate to announce that the Constitution compels a specific time limit." *Id.*

---

[5]Being held in custody is, of course, a much more severe deprivation of liberty, but the case law in this area is still helpful.

at 56. But in order to "provide some degree of certainty" so that states and counties can "establish procedures with confidence that they fall within constitutional bounds," the Supreme Court announced a time requirement of 48 hours. *Id.* Yet even a 48-hour delay could violate *Gerstein* if the delay was unreasonable, and a delay greater than 48 hours could be justified under an "extraordinary circumstance." *Id.* at 56–57. Justice Thurgood Marshall, writing for three dissenting justices, would have held that a hearing must be provided immediately after arrest. *Id.* at 59. Justice Scalia, dissenting, would have preserved the common law right to a hearing as soon as reasonably possible after detention, *id.* at 61, with a maximum of 24 hours, *id.* at 68. So although the case was contentious, the upper bound on a hearing for temporary detention was 48 hours, absent extraordinary circumstances. And no justice favored leaving the timeframe uncertain.

We also hesitate to announce a timeframe, but we are well aware of the important property and liberty interests at stake in a case where people are being deprived of their only vehicle used for transportation. Wayne County's practices drove Ingram into bankruptcy, and they brought hardship on all three plaintiffs. We follow the Supreme Court's lead in *County of Riverside* in remarking that a timeframe is important for predictability. Indeed, if Wayne County provides plaintiffs an opportunity to be heard, it will be faced with answering the very same question—how quickly it must provide a hearing to avoid liability under procedural due process. While that question is fact-dependent, where a person is to be deprived of something so integral and important as here—a vehicle integral to personal transportation and liberty—then a prompt opportunity to be heard to challenge the holding of the vehicle is required.

If a probable-cause hearing can be heard within 48 hours, and other circuits have found one to three weeks to be excessive in this sort of context, then, taking the factual setting of this case into account, we hold two weeks from the date of the vehicle's seizure to be an appropriate time frame to provide the vehicle owner an opportunity to be heard to contest the holding of a vehicle vital to the owner's transportation and livelihood. Under *Mathews*, the opportunity to be heard must include "some form of hearing"[6] that "must include the following elements: (1) 'timely and adequate notice detailing the reasons for [the deprivation]'; (2) 'an effective

---

[6]We do not stipulate whether this hearing is judicial or administrative.

opportunity [for the recipient] to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally'; (3) retained counsel, if desired; (4) an 'impartial' decisionmaker; (5) a decision resting 'solely on the legal rules and evidence adduced at the hearing'; (6) a statement of reasons for the decision and the evidence relied on." *Mathews*, 424 U.S. at 325, 333 (quoting *Goldberg*, 397 U.S., at 266–71).

While requiring a hearing within 48 hours of vehicle seizure would be undeniably expeditious, it may also restrict the ability to provide an individual with adequate notice required by due process. Unlike a probable cause hearing, where the individual afforded due process is in police custody and can be notified immediately, a post-deprivation hearing for vehicle seizure requires law enforcement to first identify then notify all the relevant parties. Notification includes not merely the vehicle's driver at the time of seizure, but also the registered owner and the titled owner, who may not be the same people. Even if the relevant parties were to receive immediate notification of the hearing, 48 hours may be insufficient to arrange for childcare, time off work, or transportation to attend the hearing. As the Supreme Court opined in *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950), "[t]he right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.* at 314. Two weeks both allows for adequate process and accommodates the scheduling required by such hearings.

At this hearing, the burden of proof will be on the government to show the "probable validity of continued deprivation." *Krimstock*, 306 F.3d at 69; *see also Goldberg*, 397 U.S. at 267 (explaining the hearing is to "produce an initial determination of the validity" of the deprivation).

VI.

In sum, we **AFFIRM** the district court and **REMAND** for further proceedings consistent with this opinion.

----------------------

## CONCURRENCE

----------------------

THAPAR, Circuit Judge, concurring. The Constitution requires the government to provide prompt process before depriving someone of life, liberty, or property. Normally, that means a hearing. But Wayne County, Michigan hasn't followed that simple requirement. The County has been seizing cars, holding them for months, and denying hearings to anyone bold enough to ask for them. There's only one surefire way to get your car back: pay up. How much? $900 if it's the first time the County seized your car. $1,800 if it's the second time. Or $2,700 if it's the third. Even worse, if you challenge the seizure too early or too late, the County can just keep your car.

Wayne County's scheme violates the Constitution's due-process requirement. Constitutional text, history, and precedent show why. History links protections for liberty and for property. And when the government arrests someone, depriving them of liberty, Supreme Court precedent requires a preliminary hearing within 48 hours. I would apply the same rule to Wayne County's seizure of the plaintiffs' property.

## I.

Wayne County claims that it seizes cars to fight crime (and holds onto them for months for the same reason). But the County is happy to return those very cars as soon as it gets paid. That practice proves the County's scheme is simply a money-making venture—one most often used to extort money from those who can least afford it.

Consider the plaintiffs' experiences. Melisa Ingram works full time and goes to school at night. When her boyfriend asked to borrow her car to find a job, she loaned it to him. Rather than using it to find a job, he used the car to pick up a prostitute. The police pulled him over and seized the car. When Ingram tried to get it back, Wayne County officials told her she'd have to wait four months for a hearing. So rather than spend the long Michigan winter without a car, she paid the ransom Wayne County demanded: $1,355 (the $900 "redemption fee" plus towing and storage).

Several months later, Ingram loaned her car to her boyfriend again. This time, for him to attend a barbecue. Police pulled him over again and took the car, claiming the house he went to was linked to prostitution or drugs. Just like the last time, Ingram demanded her car back from the County. Yet again, County officials told her the best way to get her car back was to pay the redemption fee—increased this time to $1,800. But the first redemption fee had bankrupted her; she couldn't afford to pay another one. Ingram never got her car back.

Stephanie Wilson is a single mom, pursuing her nursing degree at a community college. Her daughter's father is a homeless drug addict. Out of pity, Wilson twice agreed to give him a ride, and twice that cost her a car. Both times, the police took her car only moments after she picked up her daughter's father. After the first seizure, Wilson went to the County office building to get her car back. She was told to come back later. When she did, she was told it was too late—she lost the car forever. Then, she bought a second car from a tow yard using her tax refund. The County took that one too. She insisted on a hearing, but the County delayed and pressured her to pay the $1,800 redemption fee instead. Eventually, a state judge forced the County to return Wilson's car.

Robert Reeves, a construction worker and father of five, had his car taken by the County after leaving a job site. And it wasn't even for anything he'd done or for anything connected to his car. His coworker had allegedly stolen a piece of equipment from Home Depot. Robert didn't know anything about the theft and had seen rental paperwork for the equipment, but the police arrested him and seized his car anyway. The County held onto his car for more than six months even though they let him out of jail after just a few hours.

Does this sound like a legitimate way of cleaning up Wayne County? Or does it sound like a money-making scheme that preys on those least able to fight it? To ask the question is to answer it.

## II.

Ingram, Wilson, and Reeves claim that Wayne County's car-forfeiture procedure violates the Due Process Clause of the Fourteenth Amendment. They argue we should apply *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court's due-process balancing test. Wayne County

argues for a different balancing test, *Barker v. Wingo*, 407 U.S. 514 (1972). Framed this narrowly, I agree with the majority that *Mathews* is the better fit. But "better" doesn't mean "good." In fact, *Mathews* has several problems.

First, *Mathews* suffers from problems common to many balancing tests. It requires us to compare values that aren't comparable: (1) the individual's interest in more process, (2) the government's interest in providing the same or less process, and (3) the risk of error in current procedures and the probable value of additional protections. *Mathews*, 424 U.S. at 335. This test puts judges in an impossible position. "It is more like judging whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring).

Also like other balancing tests, *Mathews* leads to unpredictable results. With three subjective factors at play, will two judges ever balance them in the same way? I'm skeptical. And unpredictability hurts everyone. It's a problem for government officials who don't know what they're required to do. But *Mathews* also harms ordinary people. It prevents them from helping themselves. They can't call out government officials for violating their rights because *Mathews* doesn't say what those rights are. Instead, it says that sometime later a judge will let them know. A potential court victory years in the future is little solace for the Melisa Ingrams and Stephanie Wilsons of the world who need their cars now for work and school.

Apart from these problems, which are common to all balancing tests, *Mathews* also suffers from unique shortcomings. For one, *Mathews* doesn't account for all the important interests at stake. "Nowhere does the test allow the Court to weigh the plain old value of process itself, *i.e.*, of simply knowing why the government has decided to take action against you." *Hicks v. Colvin*, 214 F. Supp. 3d 627, 641 n.7 (E.D. Ky. 2016). For another, under *Mathews*, everything is negotiable. "[A]ll process is, potentially, up for sale." *Id.* at 643 n.8. But that's not what the Constitution says. It says you're entitled to process when the government deprives you of "life, liberty, or property." U.S. Const. amend. XIV, § 1. That should be where we start and end.

Squishy standards like *Mathews* don't provide sufficient guidance for anyone. Not for government officials. Not for lower courts. And, most importantly, not for the people whose rights the Constitution protects.

### III.

Fortunately, we aren't stuck with *Mathews*. Time and again, the Supreme Court has disregarded balancing tests when history and tradition supply a more rights-protective framework. It's done so for the Second Amendment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127–30 (2022). And the Fourth Amendment. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 406–07 (2012). And, most significantly for our purposes, the Due Process Clause of the Fourteenth Amendment. *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2039–40 (2023) (plurality op.); *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 619 (1990) (plurality op.). So to determine the meaning of the Due Process Clause, we should look beyond *Mathews* to our nation's history and tradition.

A survey of that history reveals two key insights. First, property and liberty have always been intertwined. Second, speedy process was an important protection for both rights. The Supreme Court has translated these deeply rooted values into a bright-line rule to protect liberty: the government must hold a preliminary hearing within 48 hours of arresting someone. I would apply the same rule to Wayne County's seizure of the plaintiffs' property.

### A.

The link between liberty and property runs deep in our law. A century before the American experiment even began, English philosopher John Locke wrote that the "law of nature . . . teaches all mankind" that "no one ought to harm another in his life, health, *liberty, or possessions*." John Locke, *Two Treatises of Government*, Pt. II § 6 (1690) (emphasis added). Locke wasn't the only prominent Englishman to make the connection between liberty and property. That same link appears throughout William Blackstone's *Commentaries on the Laws of England*. Blackstone wrote that "personal security, personal liberty, and private property" are "the three great and primary rights." 1 Blackstone, *Commentaries on the Laws of England* *136. And courts had an important role in upholding these rights: "Since the law is in England the

supreme arbiter of every man's life, liberty, and property, courts of justice must at all times be open to the subject." *Id.* at *137.

It's no surprise, then, that the same link appears in the text of the Constitution. For example, the Fourth Amendment guards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Notably, it doesn't distinguish between seizures of persons and seizures of property. Then there's the Fifth Amendment, which provides, "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Here too, liberty and property walk in lockstep.

Evidence from the ratifying debates establishes the same link. Champions of the Constitution, like Alexander Hamilton, assured the American people that the Constitution would protect "property *and* liberty" from "foreign invaders." The Federalist No. 25, at 125 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) (emphasis added). Not everyone was so sure. Opponents of ratification, the Anti-Federalists, thought the new national government would infringe on liberty and property rights. *See, e.g.*, Brutus, *Essay I* (Oct. 18, 1787), *in The Anti-Federalist: Writings by the Opponents of the Constitution* 108, 110 (Herbert J. Storing ed., 1985); Brutus, *Essay II* (Nov. 1, 1787), *in The Anti-Federalist*, *supra*, at 117, 119. So they proposed a bill of rights that would protect both liberty and property. *See, e.g.*, Brutus, *Essay II* (Nov. 1, 1787), *in The Anti-Federalist*, *supra*, at 120; *The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to Their Constituents*, *in The Anti-Federalist*, *supra*, at 202, 207. Despite their disagreements, both the proponents and opponents of the Constitution agreed that liberty and property went hand in hand.

Early American legal documents made this same connection between liberty and property. For example, the influential 1776 Virginia Declaration of Rights listed among the "inherent rights" of all men "the enjoyment of life and liberty, with the means of acquiring and possessing property." Va. Decl. of Rights § 1 (1776); *see also* Northwest Ordinance art. II (1787) ("No man shall be deprived of his liberty or property, but by the judgment of his peers or the law of the land."). The judges interpreting these laws said the same thing. *See, e.g.*, *Bayard v. Singleton*, 1 Mart. 42, 45 (N.C. Super. Ct. L. & Eq. 1787) (reasoning that if a legislature could

"require [a defendant] to stand condemned in his property without a trial, it might with as much authority require his life to be taken away without a trial by jury"). In short, much evidence from before and during the founding era links liberty and property.

This link persisted through our nation's second founding. The text of the Fourteenth Amendment's Due Process Clause mirrors the text of the Fifth Amendment's Due Process Clause: "nor shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Once again, liberty and property go side by side. And that's no accident. The Fourteenth Amendment's supporters repeatedly linked liberty and property. *See, e.g.*, *Mr. Bingham's Speech*, Wheeling Daily Intelligencer, Sept. 5, 1866, at 2; *Speech of Indiana Gov. Oliver P. Morton on the Fourteenth Amendment, New Albany, IN*, *in* 2 *The Reconstruction Amendments: The Essential Documents* 251 (Kurt T. Lash ed., 2021). So too did the Civil Rights Act of 1866. Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 ("[S]uch citizens, of every race and color . . . shall have the same right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens."). No matter where we look in our nation's history, we'll find property and liberty traveling together.

### B.

For both property and liberty, speedy process has been an important protection since the beginning of the Republic.

Start with property. Early in our nation's history, the remedy for illegal government seizures was a replevin action—a lawsuit for the return of unlawfully obtained property. Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 43–44 (2018). According to Blackstone, this action was "a tedious method of proceeding." 3 William Blackstone, *supra*, at *147. "[G]oods were long detained from the owner, to his great loss and damage." *Id.* To avoid such delays, Parliament passed statutes that provided for the immediate return of property after someone filed a writ of replevin (although the petitioner also had to guarantee that he would pay to return the property if he lost). John W. Patton, *The New Replevin in Pennsylvania*, 54 Am. L. Register 123, 124 (1906).

Not to be outdone by English Parliament, in 1790, Congress passed a landmark statute to protect property: the Remission Act. The Act responded to Alexander Hamilton's fear of "heavy and ruinous forfeitures." Kevin Arlyck, *The Founders' Forfeiture*, 119 Colum. L. Rev. 1449, 1482–85 (2019); *see* Alexander Hamilton, *Report on the Petition of Christopher Saddler* (Jan. 19, 1790), *in* 6 *The Papers of Alexander Hamilton* 191, 191–92 (Harold C. Syrett & Jacob E. Cooke eds., 1962). It promised speedy process in property-forfeiture cases. Act of May 26, 1790, ch. 12, § 1, 1 Stat. 122, 122 (requiring that when a person challenges a fine or forfeiture, a judge "shall inquire in a summary manner" into the case).[1] And most claimants capitalized on that process, filing their petitions as soon as they could. Arlyck, *supra*, at 1485. In sum, English and early American history reveal how our law protected property in large part through speedy process.

Speedy process was just as important a protection for liberty as it was for property. For more than 800 years, the greatest protection for liberty, the writ of habeas corpus, has allowed prisoners being held without process to challenge their detention. Clark D. Forsythe, *The Historical Origins of Broad Federal Habeas Review Reconsidered*, 70 Notre Dame L. Rev. 1079, 1089 (1995). And, unsurprisingly, timely action on the writ was always critical. Two seventeenth-century English statutes required either the government or the courts to act within a few days. Habeas Corpus Act, 16 Car. 1, c. 10 (1641); Habeas Corpus Act, 31 Cha. 2, c. 1 (1679). Many early state constitutions and laws included the same or similar requirements.[2] By the mid-nineteenth century, speedy process was the national standard in habeas proceedings. *See* Habeas Corpus Act of 1867, ch. 28, § 1, 14 Stat. 385, 386.

---

[1]*See also* Act of Mar. 3, 1791, ch. 15, § 43, 1 Stat. 199, 209 ("That it shall be lawful for the judge of the district within which such penalty or forfeiture shall have been incurred . . . to inquire in a summary way into the circumstances of the case.").

[2]England's 1679 Habeas Corpus Act "came to play a central role in the development of early American habeas corpus jurisprudence." Amanda L. Tyler, *Habeas Corpus in Wartime: From the Tower of London to Guantanamo Bay* 25 (2017); *see also* 2 James Kent, *Commentaries on American Law* 28 (Oliver Wendell Holmes, Jr. ed., 12th ed., 1884) ("[That statute] is the basis of all the American statutes on the subject."); 3 Joseph Story, *Commentaries on the Constitution of the United States* 208 (1833) ("That statute has been, in substance, incorporated into the jurisprudence of every state in the Union."). Indeed, many early state constitutions and statutes incorporated the entire 1679 Act or several of its key provisions. Tyler, *supra*, at 119–20.

Why such a rush?  Because we shouldn't allow an innocent man to be wrongfully imprisoned.  4 Blackstone, *supra*, at *352 ("[I]t is better that ten guilty persons escape, than that one innocent suffer.").  And one of the best ways to avoid that is speedy process.  Similarly, one of the best ways to ensure that someone isn't wrongfully deprived of property is speedy process.

### C.

Informed by our tradition of linking protections for property and for liberty, I would require Wayne County to hold a hearing within 48 hours.  Under current law, the government must hold a probable-cause hearing within 48 hours of arresting someone.  *County of Riverside v. McLaughlin*, 500 U.S. 44, 47, 56 (1991).[3]  The plaintiffs deserve the same when the government seizes their car.

This would be easy to do.  In most situations, the government could combine the probable-cause and seizure hearings.  For example, in Robert Reeves's case, the County had to show probable cause for his arrest anyway.  Adding a lawful basis for the seizure is not much to ask.  Indeed, the facts supporting the arrest and property seizure will be identical.  So it'll take only a few extra minutes to discuss the property seizure.  This may seem like a small change, but for people like Ingram, Wilson, and Reeves this is the difference between getting the process the Constitution demands and none at all.

To be sure, we don't always apply the same protections to property and liberty.  In some cases, liberty deserves more protection than property.  *See, e.g.*, 1 Blackstone, *supra*, at *131–32 ("[C]onfinement of the person by secretly hurrying him to gaol, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government" than "violence to confiscate his estate."); *Fowler v. Benson*, 924 F.3d 247, 261 (6th Cir. 2019).  Likewise, the Fourth Amendment (the source of the 48-hour rule for probable cause hearings) and the Fourteenth Amendment's Due Process Clause differ in

---

[3]Justice Scalia disagreed with the majority.  He believed that the common law commanded a hearing within 24 hours, not 48.  *McLaughlin*, 500 U.S. at 61 (Scalia, J., dissenting).  And, at least according to Justice Scalia, the hearing should be held much faster than that.  Traditionally, the government had to provide a probable-cause hearing as soon as it could find a magistrate.  *Id.* ("[A] person arresting a suspect without a warrant must deliver the arrestee to a magistrate 'as soon as he reasonably can.'" (quoting 2 Matthew Hale, *The History of the Pleas of the Crown* 95 n.13 (1st Am. ed. 1847))).

important ways, so we don't apply them identically. *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975). But the Supreme Court has already answered both objections in this very context. In a due-process case about property, the Court applied the Sixth Amendment speedy-trial standard rather than *Mathews*. *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 564–65 (1983). So precedent shows that courts can analogize to protections from other constitutional provisions as we decide what process is due. Thus, by applying an analogous liberty protection to property, we'd be following the path the Supreme Court paved.

The majority is concerned the 48-hour rule isn't practical. I disagree, at least when it comes to cars. And that's all this case requires us to address. Cars are central to the way we live. So people whose cars are taken will want a hearing right away, not in two weeks. Indeed, for many people Wayne County seizes cars from, it's their only way of transportation. So, to attend a hearing, they'll arrange for time off work or a babysitter if it means they get their car back sooner. And like most constitutional rights, people could waive the 48-hour requirement if they needed a later hearing.

Nor will notice be a problem. For occupied cars, police will tell the driver that they're seizing the car. For unoccupied or abandoned cars, police can easily reach into the glovebox and find the owner's information on the title or registration. And if all else fails, the government could search its own records to determine the owner. After all, every state requires cars to be registered with a state agency. *Vehicle Registration Fees by State*, National Conference of State Legislatures (Feb. 4, 2020), https://www.ncsl.org/transportation/vehicle-registration-fees-by-state. So even if there might be practical concerns with applying the 48-hour rule to other kinds of property, cars are different.[4]

One practical effect the 48-hour rule might have: it might cause Wayne County to consider other options before seizing someone's car. After all, if the County must provide a hearing within 48 hours of seizing someone's car, it might choose not to seize the car.

---

[4]Recognizing that the Constitution protects property essential to our everyday lives would be nothing new. Indeed, cars already get special treatment under the Fourth Amendment. *See, e.g.*, *Carroll v. United States*, 267 U.S. 132 (1925).

No. 22-1262                     *Ingram v. Wayne County, Mich.*                     Page 35

The County might instead choose to provide a warning. For example, when the police caught Ingram's boyfriend with a prostitute, they could have called Ingram to tell her what was going on. Or the police could have arrested the boyfriend. Instead, Wayne County seized Ingram's car without allowing her to challenge the seizure. And it's easy to see why. The County can keep the car for months before it owes anyone an explanation, all the while charging a storage fee. The 48-hour rule would change that.

To understand why, consider the following example. Imagine you could take a car from a dealer's lot without paying, keep it for months, and make the car dealer pay you to give it back. Sounds like a pretty good deal. But now imagine that within 48 hours of taking the car, you'd have to explain yourself to a judge—and give it back if you didn't have a good reason. You'd probably think twice before scoring a new ride. Likewise, enforcing a 48-hour rule would help prevent the kinds of abuses we see here.

Simply put, if the government wants to take away a piece of property that is essential to the way most of us live, it should provide a hearing within 48 hours.

\*     \*     \*

When history and tradition establish a right, courts can't balance it away. Applying *Mathews* here risks just that. Instead, informed by our nation's tradition of speedy process for deprivations of property and liberty, I would hold that Wayne County violated due process by failing to provide a hearing within 48 hours of seizing the plaintiffs' cars.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1262

MELISA INGRAM; ROBERT REEVES; STEPHANIE WILSON,

    Plaintiffs - Appellees,

    v.

WAYNE COUNTY, MICHIGAN,

    Defendant - Appellant.

```
┌─────────────────────────────┐
│          FILED              │
│        Aug 31, 2023         │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

Before:  GIBBONS, THAPAR, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk